**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CARBON FUEL COMPANY, a West
Virginia corporation,
<u>Plaintiff-Appellant,</u>

v.

USX CORPORATION, a Delaware
corporation; U. S. STEEL MINING
CO., INC., a Delaware corporation,

<u>Defendants-Appellees,</u>

v.

ARCH MINERAL CORPORATION; ARCH
MINERALS OF KENTUCKY;
CONSOLIDATION COAL COMPANY; OLD
BEN COAL COMPANY,
<u>Third Party Defendants.</u>

No. 95-2471

CARBON FUEL COMPANY, a West
Virginia corporation,
<u>Plaintiff-Appellee,</u>

v.

USX CORPORATION, a Delaware
corporation; U. S. STEEL MINING
CO., INC., a Delaware corporation,
<u>Defendants-Appellants,</u>

No. 95-2496

v.

ARCH MINERAL CORPORATION;
CONSOLIDATION COAL COMPANY; OLD
BEN COAL COMPANY,
<u>Third Party Defendants-Appellees,</u>

and

ARCH MINERALS OF KENTUCKY,
<u>Third Party Defendant.</u>

2

CARBON FUEL COMPANY, a West
Virginia corporation,
Plaintiff-Appellee,

v.

USX CORPORATION, a Delaware
corporation; U. S. STEEL MINING
CO., INC., a Delaware corporation,
Defendants-Appellees,

v.

ARCH MINERAL CORPORATION; OLD
BEN COAL COMPANY,
Third Party Defendants-Appellants,

and

ARCH MINERALS OF KENTUCKY;
CONSOLIDATION COAL COMPANY,
Third Party Defendants.

No. 95-2522

3

CARBON FUEL COMPANY, a West
Virginia corporation,
Plaintiff-Appellee,

v.

USX CORPORATION, a Delaware
corporation; U. S. STEEL MINING
CO., INC., a Delaware corporation,
Defendants-Appellees,

No. 95-2523

v.

CONSOLIDATION COAL COMPANY,
Third Party Defendant-Appellant,

and

ARCH MINERAL CORPORATION; ARCH
MINERALS OF KENTUCKY; OLD BEN
COAL COMPANY,
Third Party Defendants.

Appeals from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(CA-93-1073-2)

Argued: June 3, 1996

Decided: November 18, 1996

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
MACKENZIE, Senior United States District Judge for the Eastern
District of Virginia, sitting by designation.

_____

Affirmed in part and remanded in part by published opinion. Judge
Murnaghan wrote the opinion, in which Senior Judge MacKenzie
joined. Judge Williams wrote an opinion concurring in the judgment.

**COUNSEL**

**ARGUED:** James Knight Brown, Sr., JACKSON & KELLY, Charleston, West Virginia, for Appellant. James Michael Jarboe, USX CORPORATION, Pittsburgh, Pennsylvania; Anthony J. Polito, POLITO & SMOCK, P.C., Pittsburgh, Pennsylvania; John Allen Lucas, HUNTON & WILLIAMS, Richmond, Virginia, for Appellees. **ON BRIEF:** W. Henry Jernigan, Jr., JACKSON & KELLY, Charleston, West Virginia; Larry L. Roller, CARBON FUEL COMPANY, Chesapeake, West Virginia, for Appellant. Gregory B. Robertson, Bruin S. Richardson, III, HUNTON & WILLIAMS, Richmond, Virginia; Charles L. Woody, SPILMAN, THOMAS & BATTLE, Charleston, West Virginia, for Appellees.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

The instant appeal and cross-appeal concern the financial responsibility for premiums assessed against coal mine operators under the Coal Industry Retiree Health Benefits Act of 1992 ("the Coal Act" or "the Act"), 26 U.S.C. §§ 9701-9722, to finance health care for retired United Mine Workers of America ("UMWA") miners and their dependents. Plaintiff-Appellant Carbon Fuel Company ("Carbon") filed a lawsuit against USX Corporation and U.S. Steel Mining Co. ("USX") seeking a decree that under a settlement agreement and lease between the two companies, USX was required to pay for certain of Carbon's Coal Act premiums. USX filed a counterclaim against Carbon seeking a declaration of all the parties' rights and obligations under the Coal Act and initiated a third-party lawsuit against Arch Minerals Corporation ("Arch"), Old Ben Coal Company ("Old Ben"), and Consolidation Coal Company ("Consol"), contending that, under sales agreements with those companies, they were all liable to pay for certain of USX's Coal Act premiums. On cross motions for summary judgment, the district court held that the Coal Act abrogated all pre-Act contracts transferring obligations to finance health care for retired miners. Carbon Fuel Co. v. USX Corp., 891 F. Supp. 1186 (S.D.W. Va. 1995). Alternatively, the district court stated that if the agree-

5

ments were applied, they would not transfer any Coal Act obligations or allow for indemnification. For the following reasons, we affirm in part. We remand so that the district court may determine whether USX must reimburse Arch, Consol, and Old Ben for attorney's fees.

I

All five mining companies involved in this lawsuit were parties to pre-Act commercial transactions involving the sale or lease of coal mines. Supporting agreements and contracts in those transactions contained provisions regarding the assumption of liabilities imposed by collective-bargaining agreements with the United Mine Workers of America ("UMWA") and cross-indemnification clauses. In particular, those agreements transferred liability to funds established through collective bargaining to provide UMWA retirees health benefits. Subsequent to the execution of the agreements, the United States Congress, however, enacted the 1992 Coal Act which created a new mechanism for allocating the costs of health benefits for UMWA retirees. We are confronted with the question of whether the various agreements obligate parties to them to reimburse other parties for assessed premiums under the Coal Act. In addressing that question, we find that it is helpful to have a reference framework, which includes some details of the events leading up to the Coal Act, the Act itself, and the agreements.

A. 1992 Coal Act's Predecessors

In 1946, the members of UMWA went on a nationwide strike over health and retirement benefits. The crisis led to the nationalization of the coal mines by President Truman, and eventually a collective-bargaining agreement establishing health and retirement benefits funded by an industry-wide royalty on tons of coal produced for use or sale. When the coal mines were returned to their owners in 1947, UMWA and the Bituminous Coal Operators Association, Inc. ("BCOA") agreed upon the first in a series of National Bituminous Coal Wage Agreements ("NBCWAs"). The 1950 NBCWA established a multiemployer fund to provide welfare and retirement benefits to active and retired miners and their dependents.[1] The 1950 Fund

_____

[1] Multiemployer plans are characteristically maintained to fulfill the terms of collective-bargaining agreements. A group of employers makes

6

was established as an irrevocable trust to be financed on a pay-as-you-go basis. Each mining company's contributions were calculated based on tons of coal mined. The basic contours of that agreement continued through subsequent NBCWAs until the early 1970s.

In the early 1970s, UMWA and BCOA realized that their system of funding the welfare and retirement fund needed an overhaul in light of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, and changing demographics. The 1974 NBCWA, therefore, divided the 1950 Plan into several separate multiemployer plans. It established a 1950 Pension Plan and Benefit Plan and a 1974 Pension Plan and Benefit Plan. The 1950 Benefit Plan provided health-care benefits to miners who retired prior to January 1, 1976, and their dependents. The 1974 Benefit Plan provided health-care benefits to miners who were active, or who retired on or after January 1, 1976, and their dependents. Importantly, the 1974 NBCWA provided that the benefits would be guaranteed for the life of the covered retirees. Mining companies who signed the 1974 agreement agreed to fund both the multiemployer 1950 and 1974 Benefit Plans based on cumulative hours worked as opposed to tons of coal mined.

In 1978, the NBCWA shifted away from the multiemployer funded plans to a decentralized system under which each mining company financed its own health benefit plan through individual employer plans ("IEPs"). The 1978 NBCWA provided that miners and their dependents who retired prior to January 1, 1976, would still receive benefits from the 1950 Benefit Plan. A miner retiring on or after January 1, 1976, however, would receive health-care benefits from an IEP operated by his or her last employer. Signatory coal companies to the 1974 Benefit Plan would continue to fund the 1974 Plan in order to provide benefits for those miners retiring on or after January 1, 1976, who were "orphaned" because their last employer was no longer in the coal mining business or participating in the Plan. Very signifi-

_____

contributions to a multiemployer plan. The plan pools those funds into a general fund available to pay any benefit obligation of the plan. Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602, 605 (1993).

7

cantly, the 1978 NBCWA also contained an "evergreen clause" which imposed a perpetual obligation on mining companies to continue their contributions to the 1950 and 1974 Benefit Plans. See UMWA 1974 Pension v. Pittston Co., 984 F.2d 469, 471-76 (D.C. Cir. 1993), cert. denied, 509 U.S. 924 (1993).

The Benefit Plans came under great strain in the 1980s. Numerous mining companies left the mining business, leaving their "orphaned" retirees to be covered by the 1974 Benefit Plan. Other mining companies who failed to sign successor NBCWAs were able to discontinue their IEPs and shift the responsibility for paying"orphaned" retirees' benefits to the 1974 Benefit Plan. A shrinking number of signatories to the NBCWAs thus came to carry the responsibility for an increasing number of orphan retirees. That problem was exacerbated by increasing costs of health care in the 1980s, thereby creating a financial crisis in the Benefit Plans.

In 1989, the threat of insolvency in the 1950 and 1974 Benefit Plans led to a multi-month coal strike by the UMWA at the Pittston Coal Company, which was only settled after the intervention of the Secretary of Labor. That settlement resulted in the creation of an Advisory Coal Commission on UMWA retiree health benefits. The Coal Commission found that UMWA members had received a commitment of health-care benefits for life and had traded lower pensions over the years for better health-care benefits, but that the funds to finance those benefits were in grave danger of insolvency absent legislative action. It further found that collective bargaining was no longer capable of solving the problem of financing the Benefit Plans and recommended a legislative solution. See Coal Commission Report: A Report to the Secretary of Labor and the American People vii-viii, 1-5, 58-60 (Nov. 1990).[2]

_____

[2] Further details regarding the events leading up to the enactment of the Coal Act are recounted elsewhere. See, e.g., Blue Diamond Coal Co. v. Shalala (In re Blue Diamond Coal Co.), 79 F.3d 516, 518-20 (6th Cir. 1996); Davon, Inc. v. Shalala, 75 F.3d 1114, 1117-18 (7th Cir. 1996), pets. for cert. filed, 64 U.S.L.W. 3741, 3742 (Apr. 22 & 23, 1996); LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 481-86 (2d Cir.), cert denied, ___ U.S. ___, 116 S. Ct. 298 (1995); Templeton Coal Co. v. Shalala, 882 F. Supp. 799, 806-09 (S.D. Ind. 1995), aff'd, 75 F.3d

8

B. 1992 Coal Act

The Commission's report helped spur Congressional investigation of UMWA's retiree benefits and the enactment of the 1992 Coal Act, Pub. L. No. 102-486, 106 Stat. 2776, 3036-56 (codified at 26 U.S.C. §§ 9701-9722). The Act sought to remedy the problems with the provision and funding of health-care benefits to UMWA retirees by placing funding responsibility on the "persons most responsible for plan liabilities." Coal Act, 106 Stat. 3037 § 19142.

To effect its purpose, the Act established a new funding mechanism for health-care benefits for those who received benefits from the 1950 and 1974 Benefit Plans by creating a new Combined Fund, which merged both the 1950 and 1974 Benefit Plans' funds. 26 U.S.C. § 9702. In order to ensure its sound financial health, the Act changed the basic method of funding from an operation-based formula (e.g., calculated according to tons of coal produced or hours worked) to one where specific beneficiaries would be assigned to mining companies which they had worked for in the past--"signatory operators" that "remain[ ] in business." Id. § 9706.[3]"A signatory operator" is a company that was a signatory to a coal wage agreement. Id. § 9701(c)(1). Signatory operators are considered to be "in business" if they conduct business and derive revenues from any business activity, regardless of whether that activity is in the coal industry. Id. § 9701(c)(7). Orphaned employees are apportioned among the signatory operators. Id. § 9704(d).

The Act provides that the Commissioner of Social Security ("the Commissioner") will make all assignments. Id. § 9706.[4] The Act pro-

_____

1114 (7th Cir. 1996), pets. for cert. filed, 64 USLW 3741, 3742 (April 22 & 23, 1996); UMWA v. Nobel, 720 F. Supp. 1169, 1173-78 (W.D. Pa. 1989), aff'd, 902 F.2d 1558 (3d Cir. 1990), cert. denied, 499 U.S. 904 (1991).

[3] The Act also continued the IEPs established in the 1978 NBCWA and created a new 1992 UMWA Benefit Fund. Those financing mechanisms are not relevant to the instant lawsuit.

[4] Effective March 31, 1995, Pub. L. 103-296, Title I, §§ 108(h)(9)(B), 110(a), August 15, 1994, 108 Stat. 1487, 1490, amended 26 U.S.C. § 9706, by replacing the Secretary of Health and Human Services ("the Secretary") with the Commissioner of Social Security. The assignments contested here were made by the Secretary.

vides that the Commissioner shall assign each retiree covered by the Combined Fund to a signatory operator in the following order: (1) first, to the signatory operator which was a signatory to the 1978 NBCWA and the most recent signatory operator to employ the retiree in the coal industry for at least two years; (2) second, to the signatory operator which was a signatory to the 1978 NBCWA and was the most recent signatory operator to employ the retiree in the coal industry; and (3) third, to the signatory operator which employed the retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 NBCWA. Id. § 9706(a).

By holding all signatory operators to NBCWAs--which the Coal Commission found had fostered an expectation of life benefits and benefitted from UMWA concessions in exchange for better health-care benefits--the Act placed responsibility on the "persons most responsible for plan liabilities." In order to do that, the Conference Report expressed Congress's view that it would "reach back" to those operators who "had bargained out of their funding obligations." 138 Cong. Rec. S17566-01, 17603.

The Act also provides that assignment of eligible beneficiaries can be transferred to successors of assigned operators"after the enactment date" provided that the assigned operator who transferred the beneficiary assignment remains the guarantor of the benefits provided to that beneficiary under the Act. 26 U.S.C. § 9706(b)(2) (emphasis added). Thus, the Act allows post-Act contracts to reallocate assignments under the Act, although it requires that ultimate financial responsibility not be reallocated. The Act contains no similar provision regarding pre-Act contracts, which is not surprising given that Congress expressly intended to "reach back" and impose obligations on signatories to the NBCWAs notwithstanding that many companies had "bargained out of their funding obligations." 138 Cong.Rec. S17566-01, S17603.**5**

_____

**5** Additionally, in § 9706, the Act includes a provision for private civil actions that can be brought against another person for responsibility for assigned premiums, notwithstanding any prior decision by the Commissioner. 26 U.S.C. § 9706(f)(6).

10

The Act mandates that as of February 1, 1993, "[a]ll liability for contributions to the Combined Fund shall be determined <u>exclusively</u> under [the Act], including all liability for contributions to the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan." 26 U.S.C. § 9708 (emphasis added). The Act cautions, however, that the Act shall have no effect on claims, obligations, or subrogation rights arising in connection with the 1950 and 1974 Benefit Plans as of February 1, 1993. <u>Id.</u>**6**

C. <u>Lease and Sales Contracts</u>

In question here is the liability to the Combined Fund for the pre-1976 retirees assigned to USX and to Carbon by the Secretary. Carbon and USX both contend that certain lease or sales contracts and accompanying agreements may impact their liability to the Combined Fund or allow indemnification for their payments to the Fund. The relevant provisions of those agreements are as follows.

1. <u>USX and Carbon Fuel's Agreements</u>

In a 1982 Settlement Agreement, dated June 11, and a Lease and Sublease, dated June 12, Carbon sold its mining equipment to USX and leased or subleased all of its coal properties to USX for a 15-year

_____

**6** Section 9708 in its entirety provides:

> All liability for contributions to the Combined Fund that arises on or after February 1, 1993, shall be determined exclusively under this chapter, including all liability for contributions to the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for coal production on and after February 1, 1993. However, nothing in this chapter is intended to have any effect on any claims or obligations arising in connection with the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan as of February 1, 1993, including claims or obligations based on the "evergreen" clause found in the language of the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan. This chapter shall not be construed to affect any rights of subrogation of any 1988 agreement operator with respect to contributions due to the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan as of February 1, 1993.

11

term.[7] All coal mine employees were transferred to USX as well. As required by a successorship clause in the 1981 NBCWA, the Settlement Agreement provided:

> 9.9(a) Effective at the Closing, [USX] hereby assumes the National Bituminous Coal Wage Agreement of 1981, effective, June 8, 1981, (the "UMW Agreement") applicable to the operations which are the subject of this Agreement or the Coal Lease ("Covered Operations"), and[USX] will assume and agree to perform, pay and discharge Carbon's obligations under such collective bargaining agreement to the extent such obligations arose with respect to any period after the Closing. . . . Pursuant to [USX's] assumption of the UMW Agreement as provided elsewhere herein, and in accordance with the requirements of the 1950 Plan and the 1974 Plan, [USX] agrees that on and after the Closing Date it shall, with respect to the Covered Operations, be a signatory to the UMW Agreement and succeed to Carbon's obligations under the UMW Agreement to make contributions to the 1950 Plan and to the 1974 Plan in the amount and at the rate required by the UMW Agreement for the duration thereof.

The 1982 settlement agreement also provided that USX agreed to assume and perform all of Carbon's contractual obligations which relate to Carbon's performance of a 1974 agreement between Carbon and USX. That included USX's agreeing to pay certain unbilled costs such as "[p]ayments of health and medical benefits for bargaining and non-bargaining employees and related administrative costs." Thus, USX assumed Carbon's obligations under the NBCWAs to make all contributions arising after closing to the 1950 and 1974 Benefit Plans and to pay health and medical costs insofar as they related to the performance of a 1974 agreement between Carbon and USX.

Disagreements between USX and Carbon resulted in a subsequent settlement agreement in 1987, which terminated the lease and sublease. The 1987 agreement provided that "all remaining or continuing

_____

[7] The agreement resulted from disputes arising out of a prior 15-year contract in which Carbon had agreed to supply USX with coal.

12

obligations" under the 1982 settlement agreement"shall remain in full force and effect." Carbon, however, did not resume its mining operations on the land previously leased to USX. Despite Carbon's failure to re-open the covered operations and notwithstanding the terms of its settlement agreements, the Secretary assigned to Carbon UMWA retirees who had worked at the "covered operations" as Carbon's employees and retired prior to 1976.**8**

_____

**8** Carbon and USX also included several indemnification provisions in their agreements. Carbon agreed to indemnify USX,

> its officers, stockholders and directors against, and hold each of them harmless from, any and all claims . . . resulting from or arising out of the operation, administration and funding of Carbon's employee benefit plans by Carbon prior to the Closing date, including but not limited to any taxes, penalties, liens or liabilities imposed or assessed by any governmental authority, or agency, under any statute, rule or regulation applicable to the operation, administration and funding of such plans.

USX agreed to indemnify Carbon,

> its stockholders and directors against, and hold each of them harmless from, any and all claims . . . resulting from or arising out of the operation, administration and funding of[USX's] employee benefit plans by USX for all periods on and after the Closing Date.

USX also agreed more generally to indemnify Carbon

> from and against any claim, loss, damage, cost, or expense of any kind or character arising out of or resulting from . . . any claims, causes of action, debts, liabilities and obligations, incurred in connection with the assets . . . and arising out of [USX's] operation, ownership or leasehold of such assets on or after the Closing Date.

Carbon, in turn, agreed to indemnify USX

> from and against any claims, loss, damages, cost or expense of any kind or character arising out of or resulting from . . . any debts, liabilities and obligations incurred or which may be incurred with respect to any of the Excluded Assets . . . [and] any debts . . . being identified as being for the account of Carbon.

Another indemnification clause provided for cross-indemnification relating to claims for the "death of, disease incurred by or injury to persons or destruction or damage to property," any public or private nuisance, and restoration, repair or reclamation of any area, required by law or as provided in the Agreements.

13

2. <u>USX and Other Companies' Agreements</u>

In the early 1980s, USX sold off a large portion of its mining operations to Arch, Old Ben, and Consol. USX had contributed to both the 1950 and 1974 Benefit Plans based on the operations in the mines it sold. Evergreen clauses in the NBCWAs required that each new buyer covenant to provide funding to the 1950 and 1974 Benefits Plans. Thus, under their sales agreements, each purchasing company agreed in some fashion to assume USX's duties under the then existing NBCWA to contribute to the 1950 and 1974 Trusts. **9** And, in fact,

_____

**9** The Arch Sales Agreement with USX provides:

> A[rch] will assume US[X]'s obligations under the collective bargaining agreement dated June 7, 1981, then in effect between US[X] and the UMWA applicable to such employees. A[rch] will discharge all of US[X]'s obligations under such collective bargaining agreement to the extent that such obligations arise with respect to the period after Closing.

The Consol Sales Agreement with USX provides:

> Consol will assume as of Closing US[X]'s obligations under the collective bargaining agreement dated June 7, 1981, then in effect between US[X] and the UMWA applicable to such employees. Subject to Article IV(b), Consol will discharge all of US[X]'s . . . obligations under such collective bargaining agreement to the extent that such obligations arise with respect to events occurring in the period after Closing . . . it being the intention of the Parties that Consol have no liability or responsibility for any benefits due or that may become due in the future to employees of US[X] . . . who have retired prior to Closing, unless and until any such retired employee may be subsequently employed by Consol at its discretion outside its obligations pursuant to this Agreement.

The Old Ben Sales Agreement with USX provides:

> [Old Ben] will assume the collective bargaining agreements then in effect, if any, between [USX] and the UMWA applicable to these bargaining units. [Old Ben] will discharge all of [USX]'s obligations under such collective bargaining agreements, including obligations to make contributions to the 1950 Pension Plan, the 1950 Benefit Plan, the 1974 Pension Plan, and the 1974 Ben-

14

each company made its obligatory contributions to the Plans until the enactment of the Coal Act's new funding system. **10**

Each of the sales agreements also contained cross indemnification provisions very similar, if not identical, to that included in the Old Ben agreement:

> Buyers expressly assume and agree in due course to pay, perform, fulfill and discharge and to indemnify and hold harmless [USX], its officers, directors and shareholders, and their successors, heirs, administrators and assigns, from and against any claim, loss, damage, cost, or expense of any kind or character arising out of or resulting from:
>
> (i) Any claims, causes of action, debts, liabilities and obligations incurred in connection with the Acquired Assets or arising out of the ownership or operation of the Acquired Assets on or after the Business Closing, or from acts, omissions or activities of Buyers in the ownership or operation of the Acquired Assets on or after the Business Closing.
> . . .

In return, USX agreed to indemnify Buyers.

> [USX] expressly assumes and agrees in due course to pay, perform, fulfill and discharge and to indemnify and hold harmless BUYERS, their officers, directors and sharehold-

_____

> efit Plan, to the extent that such obligations arose with respect to a period after the Business Closing. Except as otherwise provided in this Agreement, [USX]'s obligation to make contributions to the above employee benefit plans shall be limited to the obligations set forth in the 1978 National Bituminous Coal Wage Agreement or its successor to make contributions for hours worked or tons of coal mined prior to the Business Closing.

**10** Employees at the mines sold who retired after January 1, 1976, received and continued to receive health benefits directly from USX under an IEP.

15

ers, and their successors, heirs, administrators and assigns, from and against any claim, loss, damages, cost or expense of any kind or character arising out of or resulting from the following:

(i) Any claims or causes of action against or debts, liabilities and obligations of [USX] incurred in connections with the Acquired Assets or arising out of the ownership or operation of the Acquired Assets prior to the Business Closing, or from the acts, omissions, or activities of [USX] in the ownership and operation of the Acquired Assets prior to the Business Closing;

\*\*\*

(iii) Any claims, causes of action, debts, obligations and liabilities of any kind or character (including, but not limited to workers' compensation claims) and any related cost or expenses, to employees of [USX], former employees of [USX], actual or potential applicants for employment at [USX], any beneficiaries of the above or any other person asserting a claim on their behalf, arising out of or resulting from any incident or event which occurs prior to the Business Closing or any claim for employee benefits related to an employee's or former employee's period of service with [USX] prior to the Business Closing.

Thus, USX agreed to indemnify Buyers for liability arising out of the operation of the mines prior to closing and the Buyers agreed to indemnify USX for liabilities arising on or after closing.

The Secretary assigned to USX a number of UMWA retirees who worked for USX at the operations transferred to Old Ben, Consol, and Arch and retired prior to 1976.

D. Lawsuit

In the spring of 1994, Carbon filed a lawsuit in federal court based on diversity jurisdiction which sought declaratory and injunctive

16

relief against USX. Carbon sought to hold USX liable based on the 1982 settlement agreement for the assigned retirees who had worked at the operations which were covered by the lease. Carbon specifically relied on the provisions where USX agreed to assume Carbon's obligations under the 1981 NBCWA collective-bargaining agreement and successor agreements and where USX agreed to assume unbilled medical costs arising out of Carbon's performance of the 1974 agreement.

USX filed a counterclaim against Carbon seeking "a declaration of the rights and obligations of the parties . . . under the [Coal Act]" and initiated a third party complaint against Arch, Consol, and Old Ben ("counterdefendants"). USX argued that, under Carbon's interpretation of the Coal Act, Arch, Consol, and Old Ben should pay for, reimburse, or indemnify it for the retirees who worked at the operations sold to those companies. USX relied on the provisions where those companies agreed to assume all liability arising under the collective-bargaining agreements which arose after closing. USX also relied on the indemnification provisions in those agreements. The counterdefendants filed a counterclaim seeking indemnification from USX for any liabilities imposed upon them or, alternatively, if no liabilities were imposed, attorney's fees and costs under the indemnification provisions in their sales contracts.

Each party filed a motion for summary judgment. After briefing and oral argument, the district court ruled that the 1992 Coal Act, in providing that, as of February 1, 1993, all contributions to the Combined Fund "shall be determined exclusively" under the Act, explicitly abrogated all pre-Act private party agreements as to financial responsibilities for pre-1976 UMWA retirees. The district court further found that the private agreements at issue would provide for the same result because they would not allow transfer of the obligations or allow for indemnification as to any of the contested assignments.

Carbon has appealed. USX has cross-appealed. The cross-defendants have appealed the district court's failure to grant them attorney's fees under the cross-indemnification provisions in the sales agreements.

17

II

A. Standard of Review

We review a district court's summary judgment ruling under a de novo standard of review. Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995); Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only where there are no genuine issues of material fact. In conducting our analysis, we review the record in the light most favorable to the nonmoving party.

B. Coal Act's Impact on Pre-Act Contractual Agreements

Carbon and USX argue that the Coal Act does not abrogate their pre-Act contracts reallocating their obligations to the pre-Act Benefit Plans. They contend that the Act recognizes and incorporates their pre-Act contracts. They also contend that the Coal Act's Combined Fund is essentially a codification of their obligations to the pre-Act Benefit Plans. Therefore, they argue that they may bring a civil action based on their pre-Act agreements for reimbursement or indemnification for their contributions to the Combined Fund which are based on assignments of retirees who worked at the mining operations they sold or leased to others. We disagree. As explained below, the Coal Act established a new funding method for financing UMWA retirees' health-care benefits that expressly created new obligations on Carbon and USX to a new and distinct fund--the Combined Fund-- notwithstanding their prior contracts. Under the Act "ALL" liability is determined by the Act, regardless of prior private agreements. Furthermore, we agree with the district court that, in any event, the contracts relied upon do not require reimbursement for Coal Act premiums paid to the Combined Fund.

Under the most basic canon of statutory construction, we begin interpreting a statute by examining the literal and plain language of the statute. William v. United States Merit Sys. Protection Bd., 15 F.3d 46, 49 (4th Cir. 1994); United States v. Allen, 2 F.3d 538, 539 (4th Cir. 1993). Absent explicit legislative intent to the contrary, the statute should be construed according to its plain and ordinary meaning. Id.

18

The Coal Act changed the entire mechanism for funding retirement benefits and required that "[a]ll liability for contributions to the Combined Fund that arises on and after February 1, 1993, . . . be determined exclusively under [the Coal Act], including all liability for contributions to the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for coal production on and after February 1, 1993." 26 U.S.C. § 9708 (emphasis added). While the Act made clear that obligations, claims, and subrogation rights arising in relation to the 1950 and 1974 Benefit Plans as of February 1, 1993, were not affected, the Act's new method became the exclusive method for determining liability to the Combined Fund on and after February 1, 1993. Id. Only liabilities imposed after February 1, 1993, to the Combined Fund are the subject of this lawsuit.

In providing that all liability for contributions to the Combined Fund, including all liability to the 1950 and 1974 Benefit Plans be determined exclusively under the Coal Act, Congress "upset[ ] otherwise settled expectations," and "impose[d] a new duty or liability based on past acts" for some coal operators. LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 489 (2d Cir.) (citation omitted), cert denied, ___ U.S. ___, 116 S. Ct. 298 (1995). While the Coal Act maintained similar benefits to those provided previously, it entirely changed the mechanism for funding those benefits by imposing what we have termed a tax. See 1992 UMWA Benefit Plan v. Leckie Smokeless, No. 96-1708, Slip op. at 19-20, ___ F.3d ___, ___ (4th Cir. Oct. 29, 1996). That tax rejected the previous methods for funding health-care benefits based on operational formulas (e.g., tons of coal mined, hours worked) achieved through collective bargaining in favor of statutory assessments which in certain instances "reached back" to companies that had left the coal business or bargained out of their prior obligations.[11] Those companies were the ones that

_____

[11] "The essence of the Conference Agreement [wa]s that those companies which employed the retirees in question, and thereby benefitted from their services, will be assigned responsibility for providing the health care benefits promised in their various collective bargaining agreements." 138 Cong.Rec. S17566-01, 17603. The Conference Report expressed the intent of Congress to "reach back" to those companies who "had bargained out of their funding obligations." Congress believed that "an equitable solution . . . require[d] that such companies remain obligated to help fund the benefit program which covers retired persons who worked for those companies." Id.

19

entered into the collective bargaining agreements and promised the UMWA members life benefits. Those companies were the ones that had benefitted from the retirees' work and efforts. Those companies were the ones that had achieved concessions from the miners in exchange for better health benefits. Those companies that bargained out of their obligations and left the mining business helped, in part, to cause near financial collapse of the Benefit Plans by causing a small number of signatory companies to shoulder the entire burden. Thus, Congress reasoned that an equitable solution would permit reaching back to place responsibility on those companies which the miners had worked for, notwithstanding their bargaining out of their obligations.

Thus, to characterize the Act, as Carbon and USX do,"as merely an `adjustment' to signatory operators' existing or pre-existing contractual obligations to fund health care benefits for UMWA miners and retirees," see Templeton Coal, 882 F. Supp. at 815, is not entirely accurate. While the Coal Act continued signatory operators' pre-existing contractual obligations to provide health-care benefits, it also "reached back" to impose new obligations on companies that had bargained out of their obligations and, in doing so, fundamentally changed the method for funding UMWA retirees' health benefits. For those reasons, we find that the Coal Act was not a mere codification of pre-existing NBCWAs as Carbon and USX claim, but rather an imposition of new obligations on certain NBCWA signatory operators.

Carbon and USX argue, however, that the Coal Act allows for their pre-Act contracts to be enforced.[12] Carbon and USX assert that 26 U.S.C. § 9706(f)(6), which provides for private civil actions to enforce responsibility of assigned premiums notwithstanding the Secretary's assignment, recognizes their ability to enforce pre-Act contracts assigning liability to the 1950 and 1974 Benefit Plans.[13] We disagree for the reasons that follow.

_____

[12] The dissent also contends that the pre-Act contracts transferring obligations to the 1950 and 1974 Benefit Plans allow for private civil lawsuits to seek reimbursement for premiums paid to the Coal Act.

[13] Section 9706(f)(6) states:

> Nothing in this section shall preclude the right of any person to bring a separate civil action against another person for responsibility for assigned premiums, notwithstanding any prior decision by the Commissioner.

20

First, the express language of the statute requires that "<u>All liability</u> for contributions to the Combined Fund that arises on and after February 1, 1993, . . . be determined <u>exclusively</u> under [the Coal Act]." 26 U.S.C. § 9708 (emphasis added). We interpret Congress to mean precisely what it said--that "All liability" to the Combined Fund be determined by the Coal Act and not prior private agreements unless expressly provided for in the Act. The Act contains no provisions that expressly provide for the enforcement of pre-Act agreements.

Second, the private agreements USX and Carbon seek to enforce were based upon and entered into under a system of funding benefits that Congress expressly abrogated because of, in part, the signatory operators' ability to contract out of their funding obligations. Congress intended the Coal Act to reach back and impose liability on the signatory operators who had contracted out of their obligations to fund retiree benefits. Allowing the enforcement of those contracts expressly undermines the intent and purpose of the Coal Act as expressed in the Conference Agreement "that those companies which employed the retirees in question, and thereby benefitted from their services . . . be assigned responsibility for providing the health care benefits promised." 138 Cong.Rec. S17566-01, 17603. While the Act expressly recognizes that post-Act contracts may be entered into in order to transfer that liability as long as the original assignee remains the guarantor of the premiums, the Act contains no similar provisions for pre-Act contracts.

Third, we do not read § 9706 as Carbon, USX, and the dissent read it, to allow for private enforcement of pre-Act contracts. To do so would allow those companies who had contracted out of their funding obligations to, in effect, avoid their obligations, notwithstanding any sort of primary liability to the Combined Fund. Instead, we read the private action provision, as the district court did, to refer to an earlier subsection of § 9706 which provides that post-Act private agreements and contracts can reallocate responsibility for assigned retirees' benefits to the Combined Fund to successor operators of mines, provided that the operator transferring the assignment remains a guarantor of the payments to the Fund.**14**

_____

**14** Section 9706(b)(2) states:

21

Carbon and USX argue, however, that disallowing pre-Act contracts renders the section allowing for private contracts superfluous. We do not think so. In allowing for reassignment under post-Act contracts, the statute states that the assigned operators shall notify the Trustees of the Combined Fund of the change in assignment. 26 U.S.C. § 9706(b)(2). The change is not made through the Commissioner. In the event of a problem, § 9706(b)(2) does not state how the problem is to be resolved. The operator who transferred its assignment remains ultimately liable as the guarantor to the trustees of the Fund. Id. All assignments by the Commissioner within a certain time limit, or, if a request for review is filed within the time limit, after his or her reconsideration, are final--they are not subject to judicial review. Id. at 9706(f). Thus, recourse may not be had with the Commissioner. The private action section makes clear that the assignor in the post-Act contract may bring a private civil action seeking reimbursement for the premiums it has paid. Id.§ 9706(f)(6).**15**

_____

> If a person becomes a successor of an assigned operator <u>after the enactment date</u>, the assigned operator may transfer the assignment of an eligible beneficiary under subsection (a) to such successor, and such successor shall be treated as the assigned operator with respect to such eligible beneficiary for purposes of [the Coal Act]. Notwithstanding the preceding sentence, the assigned operator transferring such assignment (and any related person) shall remain the guarantor of the benefits provided to the eligible beneficiary under [the Coal Act]. An assigned operator shall notify the trustees of the Combined Fund of a transfer described in this paragraph.

(emphasis added).

**15** Carbon and USX also rely on the Conference Report's description of the private action section. The Conference Report states that:

> The section on private actions provides that if parties have commercial contracts relate[d] to acquisition or disposition of coal bearing properties or facilities which delineate their respective responsibilities concerning the obligation of retiree health care, the parties may enter into private litigation to enforce such contracts for indemnification or any other form of payment allocation as may be appropriate under their private contract. Otherwise, this language does not create new private rights of

22

The dissent argues that the private agreements reallocating responsibility to the Benefit Funds may be litigated by drawing a distinction between primary responsibility to the Combined Fund and secondary liability under a private agreement to reimburse those primarily liable to the Combined Fund. Again, we must disagree. Congress expressly stated that "All liability" should be determined as provided for by the Act. Congress made no distinction between primary and secondary liability. And, contrary to the dissent's assertion that "[i]t is not surprising . . . that a statute enacted in 1992 fails to authorize parties to enter into contracts prior to 1992," Congress was well aware that signatory operators had "bargained out of their funding obligations." 138 Cong.Rec. S17566-01, 17603. If Congress had intended signatory operators to continue to be able to enforce some type of secondary liability under the private agreements it could have so stated. Indeed, Congress did allow for "a type of" secondary liability with respect to post-Act contracts. However, Congress did not provide for any liability other than that created by the Act. And Congress made clear that the Act would "expressly" determine all liability. The failure to allow for secondary liability based on pre-Act private contracts is not surprising given Congress' expressed intent to "reach back" and impose the obligation to fund retirement benefits on those signatory operators who had "bargained out of their funding obligations." 138 Cong.Rec. S17566-01, 17603.

C. Agreements and Contracts

In any event, as the district court recognized, the agreements and contracts USX and Carbon rely upon would not allow reimbursement.

_____

action where they would not exist in the absence of this provision.

138 Cong.Rec. S17566-01, S17605-06. We read "have" as ambiguous as to whether it relates to post- or pre-Act contracts. Thus, we do not view this section of the legislative history as dispositive or as expressing a clear intent to allow private pre-Act contracts. In light of the express language of the Act stating that all contributions shall be determined exclusively under the Act and the legislative history indicating that the Coal Act was intended to correct the problem of operators contracting out of their obligations to the 1950 and 1974 Benefit Plans, we find that the ambiguous "have" in the legislative history is not strong enough to create an enforcement right for pre-Act contracts.

23

Under the Carbon/USX settlement agreement, USX agreed to "assume and . . . to perform, pay and discharge Carbon's obligations under [the NBCWA of 1981] collective bargaining agreement [--which included the 1950 and 1974 Benefit Plans contributions--] to the extent such obligations arose with respect to any period after the Closing." (Emphasis added). Arch, Old Ben, and Consol also all agreed to assume under their sales agreements with USX all of USX's "obligations under [the NBCWA of 1981] collective bargaining agreement [--which included the 1950 and 1974 Benefit Plans contributions--] to the extent that such obligations arise with respect to the period after Closing." (Emphasis added).

Those provisions are inapplicable to the assignments by the Secretary or Commissioner for several reasons. First, while the obligation to assume all collective-bargaining agreements, including health-care benefits guaranteed in those agreements under the 1950 and 1974 Benefit Plans, was transferred to the successor interests, the Coal Act is not a collectively bargained agreement. Rather, it is a legislatively imposed tax. Furthermore, as explained previously, the obligations assumed under the collective-bargaining agreements are not coextensive with those imposed by the Coal Act.

Second, the obligations imposed under the 1992 Coal Act do not arise from the acquired assets in and of themselves or from events on or after the date of closing of each agreement. Although the Combined Fund and the obligations thereunder did not exist prior to the enactment of the Coal Act in 1992, the obligations the Act imposes are based on events that occurred prior to the closing date in all the transactions at issue. The new liability created by "the Coal Act links operator liability to previous employment relationships," i.e. the hiring and firing of workers, the signing of NBCWAs, the promise of lifetime benefits, and the benefits and concessions the companies received from those workers in the past. In re Chateaugay Corp., 53 F.3d at 489; cf. Davon, Inc. v. Shalala, 75 F.3d at 1114, 1126 (7th Cir. 1996) (discussing retroactive aspects of tax imposed under the Coal Act). Significantly, USX must have interpreted the agreements in this same fashion for some time because it did not seek to avoid its assessments under the 1992 Coal Act until Carbon sued it.

In addition to assuming liability under the NBCWA collective-bargaining agreements, the sales agreements USX entered into with

24

Old Ben, Consol, and Arch all contained cross-indemnification provisions. Each of the Buyers agreed to assume and hold harmless USX for all claims and the like arising in connection with the Acquired Assets "on or after the Business Closing." USX in turn agreed to assume and hold harmless the Buyers from all claims and the like arising in connection with the Acquired Assets "prior to Business Closing" and to assume all claims and the like"to employees of [USX] [and] former employees of [USX] . . . arising out of or resulting from any incident or event which occurs prior to the Business Closing <u>or any claim for employee benefits related to any employee's or former employee's period of service with [USX] prior to the Business Closing</u>." (Emphasis added).

While the Coal Act's obligations are new ones, they are based on and arise from employment relations that were initiated and ended long before the closing in any of the sales agreements. Thus, in no sense can the Buyers be held liable under the indemnification provision for the Coal Act's obligations.

Furthermore, USX agreed to hold harmless Buyers from any claim for employee benefits related to any employee's or former employee's period of service with USX prior to the closing. USX argues that this provision only relates to claims for employee benefits by employees themselves. However, we do not read the relevant contract clause in that fashion. We read USX as agreeing to hold harmless all claims, costs, or expenses "to former employees of [USX], . . . <u>or</u> any claim for employee benefits related to an employee's or former employee's period of service with [USX] prior to the Business Closing." We read the "or" as being disjunctive. We therefore read the last clause of the sentence to apply to all claims for employee benefits related to an employee's or former employee's period of service with USX prior to the closing.

The Secretary's assignments under the Coal Act are claims for employee benefits related to former employees' periods of service with USX prior to the closing. We read USX as agreeing to hold harmless Arch, Old Ben, and Consol for all such employee benefits-- excluding those imposed through the NBCWA collective bargaining process. Thus, under the indemnification clauses, for that reason as

25

well, Arch, Old Ben, and Consol are not obligated to indemnify USX for the Secretary's assessments under the Coal Act.

Similarly, indemnification provisions in the USX/Carbon Agreements do not require that USX reimburse Carbon for its Coal Act premium assessments. Indeed, in the Carbon/USX agreement Carbon expressly agreed to indemnify USX for any "claims. . . resulting from or arising out of the operation, administration and funding of Carbon's employee benefit plans by Carbon prior to the Closing Date, including but not limited to any taxes . . . imposed or assessed by any governmental authority, or agency, under any statute, rule or regulation applicable to the operation, administration and funding of such plans." As explained previously, the Coal Act premiums are taxes imposed under the Coal Act based upon Carbon's operation, administration and funding of its employee benefit plan prior to the Closing Date. Thus, we disagree with the dissent's assertion that if we permitted Carbon and USX to proceed with their lawsuit based on the contracts, remand would be necessary. The contracts are in the record. We have reviewed the contracts, the district court's findings and the parties' arguments, and conclude that the contracts do not allow for the reimbursement sought. Remand would therefore be unwarranted in any event.

D. Constitutionality

We recognize that USX and Carbon both likely understood when they entered into the relevant agreements that they were negotiating out of any obligations to fund health-care benefits for pre-1976 UMWA retirees. Thus, we briefly address the constitutionality of the Coal Act imposing new duties on Carbon and USX based on past acts, thereby upsetting settled transactions and settled expectations. In re Chateaugay, 53 F.3d at 489.

The Supreme Court has expressly held that private contracts do not present a due process bar to otherwise legitimate Congressional action. Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602, 639-41 (1993); Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 733 (1984). "[F]ederal economic legislation, which is not subject to the constraints coextensive with those imposed upon the States by the Con-

26

tract Clause of Art. I, § 10, of the Federal Constitution . . . , is subject to due process review only for rationality." Concrete Pipe, 508 U.S. at 640-41 (citations omitted); see also Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 223-224 (1986) ("Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them."); Gray, 467 U.S. at 732-33 ("We have never held, however, that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts.").

All economic legislation can be said to upset settled economic expectations of someone. "[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." Usery v. Turner Elkhorn Mining Co. , 428 U.S. 1, 16 (1976). That principle holds true "even though the effect of the legislation is to impose a new duty or liability based on past acts." Id.

The Coal Act burdens no fundamental rights. It is"`a classic example of an economic regulation' and is subject only to the minimum scrutiny rational basis test." In re Chateaugay, 53 F.3d at 486 (quoting Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 83 (1978)); see also Davon, 75 F.3d at 1121 (reaching same conclusion as to level of scrutiny applicable to due process challenge to Coal Act). We therefore accord Congress's directives under the Coal Act strong deference as economic legislation and review it only for having a rational basis. Carbon and USX bear a difficult and heavy burden to demonstrate that a piece of economic legislation is not rational. See, e.g., Davon, 75 F.3d at 1121-22.

We find that the Coal Act was a rational congressional response to a serious problem. NBCWA signatory operators through the 1970s created and fostered an expectation of lifetime health-care benefits. Templeton Coal, 882 F. Supp. at 816-17; Coal Commission Report, at vii, 1. While perhaps not the fairest scheme, the one selected by Congress for ensuring that those benefits are delivered is not irrational. The "Coal Act's financing scheme is one of proportionality. Sig-

27

natory operators bear the financial responsibility for the health care costs of assigned Combined Fund beneficiaries and their pro rata share of any `orphaned' beneficiaries." Id. at 819. The Supreme Court has upheld retroactive cost-spreading statutes where a rational connection exists between a legitimate legislative purpose and the means chosen by Congress on a number of occasions. Concrete Pipe, 508 U.S. at 636-41; Gray, 467 U.S. at 730; Turner Elkhorn, 428 U.S. at 18-19. In doing so, the Court has opined that "the imposition of liability for effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor--the operators and the coal consumers." Turner Elkhorn, 428 U.S. at 18 (upholding statute addressing black lung benefits). Likewise, the imposition of liability for promised health-care benefits on those who made the promises in the past and where the current carriers of the burden can no longer sustain the benefits, is a rational measure to spread the costs on those who benefited from the labor and concessions given in return for the promised benefits.

Numerous courts considering the constitutionality of the Coal Act have upheld it under rational Due Process review. See, e.g., Davon, 75 F.3d at 1121-26 (upholding "reach back" provisions of Coal Act under rational review analysis); In re Chateaugay, 53 F. 3d at 486-91 (same); Templeton Coal, 882 F. Supp. at 811-21 (same). As the Second Circuit reasoned in In re Chateaugay as to one coal company who left the coal mining business, and challenged the constitutionality of the Act's application to itself, that coal company

> might well have expected that other coal operators would be required to pay for [the benefits of its retirees, but the company] also could reasonably have anticipated that the 1950 and 1974 Benefit [Plans] would not be able to support the financial burdens imposed upon them as a result of escalating health care costs, the aging of the beneficiary population and the "dumping" of beneficiaries into the 1974 Benefit [Plan].

53 F.3d at 490-91. We find that Congress's solution, which seeks to reach back and impose the obligations to fund retirees' benefits on those who benefited from the retirees' work and who made the prom-

28

ises of lifetime benefits as signatories to the NBCWAs, is rationally related to its purpose of assuring health-care benefits to those retirees who were given a promise of life-time benefits."It is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them." United States v. Sperry Corp., 493 U.S. 52, 65 (1989). Furthermore, evidence indicated that mandatory contributions from all NBCWA signatory operators were necessary to secure adequate financing for the Combined Fund. Davon, 75 F.3d at 1125-26.

For those same reasons, we reject USX and Carbon's contention that the Coal Act's disparate treatment of pre-Act and post-Act contracts violates their constitutional due process and equal protection rights. Congress had rational reasons for rearranging the financing scheme for UMWA retirees' health-care benefits. It had rational reasons for imposing new obligations on coal operators who had contracted out of their obligations to the 1950 and 1974 Benefit Plans because those operators had helped foster the expectation of life-time benefits and by imposing the burden of orphan employees on a smaller and smaller number of coal operators helped jeopardize the financial health of the Benefit Plans. Under the Coal Act, those operators remain the guarantors for those life-time benefits even if they enter into post-Act contracts with successors. The Coal Act enables a "fresh start" on funding UMWA retirees' benefits. Thus, we do not find it irrational that Congress decided to allow post-Act contracts, but not pre-Act contracts.

E. Attorney's Fees

One final matter remains--the counterdefendants' motion for attorney's fees. The counterdefendants argue that the indemnification provisions in their asset sales agreements require that USX reimburse them for their attorney's fees in this lawsuit. The district court did not specifically address attorney's fees. The district court merely dismissed all pending motions as moot when it entered its summary judgment order.

Counterdefendants Old Ben, Arch, and Consol filed counterclaims seeking indemnification from USX from any and all costs and attor-

29

ney's fees they incurred in the defense of USX's counterclaim. USX failed to respond to the counterclaims on time. The district court denied USX's motion to enter an untimely answer. Thus, the clerk of the court entered a default judgment against USX on April 28, 1995. It therefore appears that the district court's failure to award attorney's fees is an oversight. If not an oversight, the district court's reasons for not awarding fees after the entry of a default judgment are unclear to us. We therefore remand solely on the question of the counterdefendants' attorney's fees.

Accordingly, we

AFFIRM IN PART AND REMAND IN PART.

WILLIAMS, Circuit Judge, concurring in the judgment:

I agree that "the agreements and contracts USX and Carbon rely upon would not allow reimbursement." Majority Op. at 23. Because the agreements and contracts of Carbon and USX do not allow for reimbursement or indemnification, we need not reach in Part II.B. the question of whether the Coal Act precludes the enforcement of such contracts. The majority's holding on this issue is simply dictum. See Bettius & Sanderson, P.C. v. Nat'l Union Fire Ins. Co., 839 F.2d 1009, 1019 n.3 (4th Cir. 1988) (Murnaghan, J., concurring in part and dissenting in part) (stating that "[t]o reach out and decide what need not be decided is frequently denigrated as dictum."). Furthermore, I disagree with the majority's dictum that pre-Act contracts cannot be enforced to indemnify or reimburse a party for its liability under the Act for payments to the Combined Fund. See Majority Op. at 18-23. Because I believe that the Act does not preclude the enforcement of such contracts, I limit my participation in the majority opinion to concurring in the judgment.

I.

I agree with the majority that the "Coal Act established a new funding method for financing UMWA retirees' health-care benefits that expressly created new obligations on Carbon and USX . . . notwithstanding their prior contracts." Majority Op. at 18. Under the Act,

30

Congress provided that all liability for contributions to the Combined Fund shall be determined exclusively under the Act through a statutory assessment imposed on signatory operators by the Commissioner. See id. at 19. I also agree that Congress intended that these statutory assessments would "reach back" to companies that had left the coal business or bargained out of their prior obligations. See id. at 19-20 & n.11.

The express language of the Act states that "[a]ll liability for contributions to the Combined Fund . . . shall be determined exclusively under [the Coal Act]." 26 U.S.C.A. § 9708 (West Supp. 1996). The majority interprets this provision as abrogating all "prior private agreements unless expressly provided for in the Act." Majority Op. at 21. However, nothing in the statute warrants this interpretation. Indeed, while I agree that "`[a]ll liability' to the Combined Fund [must] be determined by the Coal Act," id. (emphasis supplied), I cannot find anything in the Act abrogating the liabilities of parties to each other under an agreement for reimbursement, indemnification, or the like, regardless of the date of the agreement. Nowhere does the Act preclude the enforcement of pre-Act contracts. Cf. id. at 21 ("The Act contains no provisions that expressly provide for the enforcement of pre-Act agreements."). As a result, while I agree that the Coal Act imposes new duties and liabilities on Carbon and USX, I disagree with the majority's conclusion that the companies' pre-Act contracts are abrogated by the Act, and cannot be enforced to indemnify or reimburse them for their liability for payments to the Combined Fund. See id. at 20-23.

The Act specifically states that post-Act, mine operators may reallocate responsibility for assigned retirees' benefits to the Combined Fund to successor operators by private agreement or contract, provided that the operator transferring the assignment notifies the trustees of the Combined Fund and remains a guarantor of the payments to the Fund. See 26 U.S.C.A. § 9706(b)(2) (West Supp. 1996).[1] The majority correctly asserts that § 9706(b)(2) authorizes mine operators

_____

[1] I agree with the majority that no pre-Act agreement is protected by this provision, but note that parties contracting prior to 1992 could not have anticipated the Act and thus, absent clairvoyance, would not have contracted in a way that would meet the requirements of § 9706(b)(2).

31

to transfer Combined Fund liability to successor operators by contract after the Act's enactment date, see Majority Op. at 21-22, but then opines that "[i]f Congress had intended signatory operators to continue to be able to enforce some type of secondary liability under [pre-Act] private agreements it could have so stated." Id. at 23. It is not surprising, however, that a statute enacted in 1992 fails to authorize parties to enter into contracts prior to 1992. As Congress surely realized, mine operators were able to, and did, freely and lawfully reallocate responsibility for retirees' benefits to successor operators by private agreement or contract prior to 1992. Indeed, it is precisely because operators were able to lawfully bargain out of their prior employee benefit obligations, and because successor operators proceeded to default on the employee benefit obligations they assumed, that Congress enacted the Coal Act. See id. at 19 (citing legislative history).

In asserting that all pre-Act contracts are abrogated by the Act, the majority confuses the status of guarantor operators under § 9706(b)(2) with that of operators assigned primary liability to the Combined Fund under § 9706(a) who retain pre-Act contractual rights of indemnification.[2] An operator assigned Coal Act liability by the Com-

_____

**2** The majority confuses the distinction between primary liability to the Combined Fund (created by the Coal Act), and secondary liability among parties (created by private contracts) when it argues that because the Act does not expressly provide an analogue to § 9706(b)(2) for pre-Act contracts, all pre-Act contracts must therefore be abrogated. In making this argument, the majority makes an analytical leap that is unwarranted. The Coal Act does not provide a companion to § 9706(b)(2) for pre-Act contracts because the Act is expressly designed to reinstate the primary liability of the assigned operator, unless and until a post-Act transfer of liability takes place. Obviously, affording a § 9706(b)(2) transfer right to operators pursuant to their pre-Act contracts would defeat the Act's purpose of assigning primary liability to signatory operators. However, reinstating this primary liability to signatory operators is not inconsistent with allowing such operators private contractual recourse against the parties with whom they have contracted.

The majority asserts that "Congress made no distinction between primary and secondary liability." Majority Op. at 23. As evidence of this proposition, the majority chants repeatedly the mantra that "Congress

32

missioner is primarily liable and must pay into the Combined Fund, regardless of the operator's private, pre-Act contractual rights. I agree that under the Act, the Commissioner's assignments of liability to the Combined Fund are final. See Majority Op. at 22. In contrast, an assigned operator who has entered into a post-Act assignment of its primary liability will be liable as a guarantor to the Fund only if the successor operator does not satisfy the obligation. See § 9706(b)(2).

Additionally, the Act's express preservation of a broad right of "separate" civil litigation for determining responsibility for assigned premium payments, see 26 U.S.C.A. § 9706(f)(6) (West Supp. 1996), undermines the majority's conclusion that pre-Act contracts are abrogated by the Act. Although pre-Act contracts cannot function to transfer primary liability for employee benefit obligations under the Act, § 9706(f)(6) preserves the right of private civil action for determining responsibility for assigned premiums as between contracting parties.

The majority, in order to explain the very existence of § 9706(f)(6), asserts that in the event of a "problem" with payment by a post-Act successor, § 9706(b)(2) does not provide a resolution. See Majority Op. at 22. Section 9706(f)(6) exists, the majority claims, for the sole purpose of enabling the transferring operator, pursuant to its post-Act agreement, to seek indemnification (or such other payment allocation provided in the post-Act agreement) from the successor company. See id. at 22 ("The private action section [§ 9706(f)(6)] makes clear that the assignor in the post-Act contract may bring a private civil action seeking reimbursement for the premiums it has paid.").

I agree that § 9706(f)(6) enables operators who have transferred their Combined Fund liability via post-Act contractual agreements to sue for reimbursement or indemnification for the premiums they have

_____

expressly stated that `All liability' should be determined as provided for by the Act." Id. at 23; see also id. at 23 ("Congress made clear that the Act would `expressly' determine all liability."). Again, the majority looks beyond the mark. Congress did expressly state in the Act that all liability to the Combined Fund is determined by the Act. Congress, however, said nothing to abrogate the right of parties to enforce pre-Act private contracts for indemnification.

33

paid. However, I cannot find anything in § 9706(f)(6) that limits that section's preservation of private civil litigation to post-Act contracts only. The specific application of the provision to post-Act reimbursement actions says nothing about the provision's broader implications. In its entirety, § 9706(f)(6) states:

> Private actions. -- Nothing in this section shall preclude the right of any person to bring a separate civil action against another person for responsibility for assigned premiums, notwithstanding any prior decision by the Commissioner.

In my view, the Act preserves the right of parties to engage in private civil litigation for the purpose of determining responsibility for premium payments, irrespective of whether their agreements were consummated pre-Act or post-Act.[3] This reading of the Act differs from

_____

[3] The Conference Report's description of the private action section supports this conclusion:

> The section on private actions provides that if parties have commercial contracts related[d] to acquisition or disposition of coal bearing properties or facilities which delineate their respective responsibilities concerning the obligation of retiree health care, the parties may enter into private litigation to enforce such contracts for indemnification or any other form of payment allocation as may be appropriate under their private contract. Otherwise, this language does not create new private rights of action where they would not exist in the absence of this provision.

138 Cong. Rec. S17566-01, S17605-06 (1992).

The majority contends that this section of the legislative history is not persuasive because it is "ambiguous" about whether § 9706(f)(6) relates to pre- or post-Act contracts. See Majority Op. at 22 n.15. The majority asserts that

> [i]n light of the express language of the Act stating that all contributions shall be determined exclusively under the Act and the legislative history indicating that the Coal Act was intended to correct the problem of operators contracting out of their obligations to the 1950 and 1974 Benefit Plans, we find that the ambig-

34

the majority's only in that it declines to disturb the private contractual rights of parties with regard to matters beyond the concern of the Coal Act.

Thus, an operator who has been assigned primary liability by the Commissioner under the Act for employee benefit premiums to be paid into the Combined Fund may, pursuant to its pre-Act agreement, seek indemnification (or such other form of reimbursement payment as is provided in the agreement) from the successor company, "not-withstanding any prior decision by the Commissioner." § 9706(f)(6). In such a case, the Combined Fund is assured of payment regardless of whether the operator bearing primary liability successfully obtains reimbursement from the successor operator because, under the Act, the Commissioner's assignments of liability to the Fund are final. See Majority Op. at 22.

II.

Although the Act does not preclude the enforcement of pre-Act contracts, I agree with the majority that "the agreements and contracts USX and Carbon rely upon would not allow reimbursement." Major- ity Op. at 23. As a result, I agree that the agreements and contracts

_____

> uous . . . legislative history is not strong enough to create an enforcement right for pre-Act contracts.

Id. at 23 n.15.

In discussing the "express language of the Act," the majority again confuses the distinction between contributions to the Combined Fund (which are determined exclusively under the Act), and liabilities owed by parties to each other (which may be allocated by contract). Despite the resulting confusion, I agree with the majority that the express language of § 9706(f)(6) (confused or not), coupled with the legislative history (ambiguous or otherwise), does not "create new private rights of action where they would not exist in the absence of" the section. See 138 Cong. Rec. S17566-01, S17605-06 (1992). However, I find that the right to engage in private civil litigation to enforce a contract existed prior to and independent of the passage of the Act, and that nothing in the Act pre- cludes parties like Carbon and USX from engaging in such private litiga- tion to enforce their pre-Act contracts.

35

in question do not obligate USX, Arch, Consol, and Old Ben to assume the Combined Fund liability of Carbon and USX. Accordingly, I concur in the judgment of the court.