UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DILMAR OIL COMPANY,
Plaintiff-Appellant,

v.

FEDERATED MUTUAL INSURANCE
COMPANY,
Defendant-Appellee.

No. 97-1554

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Cameron McGowan Currie, District Judge.
(CA-96-114-4-22)

Argued: October 2, 1997

Decided: November 5, 1997

Before WILKINSON, Chief Judge, RUSSELL, Circuit Judge, and
BOYLE, Chief United States District Judge for the
Eastern District of North Carolina, sitting by designation.

_____

Affirmed by unpublished opinion. Chief Judge Boyle wrote the opin-
ion, in which Chief Judge Wilkinson and Judge Russell joined.

_____

**COUNSEL**

**ARGUED:** David Eliot Rothstein, NEXSEN, PRUET, JACOBS &
POLLARD, L.L.P., Columbia, South Carolina, for Appellant. Laura
Jean Hanson, MEAGHER & GEER, P.L.L.P., Minneapolis, Minne-
sota, for Appellee. **ON BRIEF:** Susan Batten Lipscomb, NEXSEN,

PRUET, JACOBS & POLLARD, L.L.P., Columbia, South Carolina, for Appellant. Nicholas A. Gumpel, MEAGHER & GEER, P.L.L.P., Minneapolis, Minnesota; Richard R. Mehrhof, Jr., ALLGOOD, CHILDS, MEHRHOF & MILLIANS, Augusta, Georgia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

BOYLE, Chief District Judge:

Plaintiff-Appellant Dilmar Oil Co. Inc. (hereinafter "Dilmar"), a South Carolina corporation, filed this action against Defendant Federated Mutual Insurance Co. ("Federated"), a Minnesota corporation, in the United States District Court for the District of South Carolina. Plaintiff's complaint included five causes of action under South Carolina law: breach of contract, declaratory judgment, misrepresentation, bad faith refusal to pay benefits, and illusory coverage. Defendant filed an answer and a Motion for Summary Judgment, covering all of Plaintiff's claims. The district court granted Federated's Motion on all of Dilmar's claims. Dilmar timely appeals.

FACTS

Dilmar is a petroleum distributor headquartered in Latta, South Carolina. Dilmar owns convenience stores and gasoline stations throughout South Carolina, and supplies petroleum products to retailers in the state. As part of its business, Dilmar maintains underground and above-ground storage tanks to hold its inventory of petroleum products.

Federated is an insurance company which marketed specialized pollution liability insurance to companies in the petroleum industry. Dilmar purchased successive Commercial Package Policies from Fed-

2

erated in effect between January 1, 1987, and January 1, 1992. The policy in effect from January 1, 1989, to July 1, 1989, is the policy at issue in the present litigation.

The policy was a "claims made" policy, requiring a claim to be made during the policy period to invoke coverage. It contained three separate insuring agreements, two of which are at issue here. Insuring Agreement 2 provides for reimbursement for "clean-up costs" because of environmental damage which is asserted under statutory authority of the government of the United States or any political subdivision thereof. Insuring Agreement 3 was added to the policy by endorsement, and provides "Voluntary `Clean-up Costs' Reimbursement." Insuring Agreement 3 provides for reimbursement for"`clean-up costs' initiated at the `insured site' during the policy period that the insured incurs. . . ."

The policy was subject to the "Coordination of Benefits With Governmental Funding Programs" endorsement ("Coordination of Benefits Endorsement," or "CBE"), which became effective on January 1, 1989. The CBE requires the insured to take all steps necessary to become eligible to participate in state underground storage tank pollution clean-up funding programs, and provides that failure to secure otherwise available state funds voids the policy to the extent that the insured could have obtained such funds. In addition, the CBE provides that if the state program disqualifies underground tank owners or operators with private liability insurance from participating in the state program solely because of the existence of such insurance, then the policy is void, allowing the insured to participate in the state program: "If the inability to secure funds is directly attributable to the existence of this insurance, coverage shall also be void so as to permit contribution from any such governmental funding program." Federated informed Dilmar of the existence of this endorsement in a separate letter before the effective date of the policy at issue.

In 1988, the South Carolina legislature enacted the South Carolina State Underground Petroleum Environmental Response Bank Act of 1988 (the "SUPERB Act"), S.C. Code Ann. § 44-2-10 et seq., which established a State-administered fund to finance the clean-up of contamination from leaking underground storage tanks. Administration of the Act is left to the South Carolina Department of Health and Envi-

3

ronmental Control ("DHEC"), subject to review by the DHEC Board and judicial review under the state Administrative Procedures Act. S.C. Code Ann. §§ 44-2-115, 44-2-130(E)(1). The SUPERB Act contains an early detection incentive amnesty program to encourage tank owners to voluntarily examine their tanks and report contamination promptly. Under this program, tank owners who reported contamination during the amnesty period were eligible to receive reimbursement for "site rehabilitation" costs. S.C. Code Ann. § 44-2-110.

During the first half of 1989, Dilmar voluntarily tested several of its sites, discovering contamination at eight sites, including its Northside Texaco facility. Dilmar reported the contamination to DHEC, seeking reimbursement of site rehabilitation costs under the SUPERB Act. Dilmar also notified Federated of the contamination, and submitted first-party voluntary clean-up cost claims to Federated. Federated denied coverage for these claims by letters dated June 15, 1989, and July 27, 1989, basing the denial on the CBE. Federated informed Dilmar that, "[b]ecause this endorsement applies to this situation, your policy is voided for the above listed incidents." There is no doubt that Federated's denials of coverage were proper under the CBE and the SUPERB Act as they existed at the time.

Effective May 9, 1990, the South Carolina General Assembly passed two amendments to the SUPERB Act that invalidated provisions, such as Federated's CBE, in liability policies which required an insured to exhaust funds available under the SUPERB program before benefits are available from the insurer. S.C. Code Ann. § 44-70(A), as amended on May 9, 1990, Act 473 § 3, 1990 Statutes at Large 2134-35. DHEC initially took the position that the 1990 Amendments did not apply retroactively; this position changed in 1991, and the General Assembly codified the retroactive application of the 1990 Amendments in 1992. Id., as amended July 1, 1992, Act 501, Part II, § 43(D), 1992 Statutes at Large 3318-19.

On September 3, 1992, DHEC wrote Dilmar regarding continued SUPERB funding at one of the latter's sites, Food Chief #24. DHEC said that it would be seeking reimbursement of funds already spent on this sight because Federated's CBE was invalidated by the 1990 and 1992 Amendments, and the existence of private insurance made payments from the SUPERB account inappropriate. The letter continued:

4

"This office will, in the very near future, provide you with the total amount of funds owed to the SUPERB Account by Dilmar Oil." In response to Dilmar's complaints, DHEC later agreed to continue to provide funding to Dilmar, but noted that the latter may need to enter into a subrogation agreement with DHEC to assign its right to sue Federated for reimbursement.

Dilmar heard from DHEC again on December 9, 1993, when DHEC informed Dilmar that the latter owed $140,910.88 as a reimbursement for clean-up at the Food Chief #24 site (as well as $219,097.29 for Food Chief #35 site).

Finally, on June 30, 1994, DHEC informed Dilmar that Dilmar's Northside Texaco site was the most likely source of contamination at the Rice Planters restaurant, and demanded that Dilmar begin abatement procedures. On August 22, 1994, Dilmar's counsel wrote to Federated informing the latter of a DHEC "directive" associated with the Rice Planters restaurant and demanding that Federated defend and indemnify Dilmar for "any liability incurred in connection with this location, including site rehabilitation costs and third party bodily injury and property damage claims." On January 23, 1995, Federated denied coverage for this claim.

DISCUSSION

Summary judgment disposes of factually unsupported claims or defenses, and requires the party opposing such a motion to come forward with a showing of the existence of a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). The party moving for summary judgment must allege the absence of a general issue of material fact in the pleadings of the other party. Celotex, 477 U.S. at 324. A summary judgment motion requires the court to look beyond the pleadings and ask whether there is a need for trial. Matsushita Electric Industr. Co., Ltd. v. Zenith Radio Corporation, 476 U.S. 574, 487 (1986). A district court's grant of summary judgment is subject to de novo review. Carbon Fuel Co. v. USX Corp., 100 F.3d 1124, 1132 (4th Cir. 1996).

A. The Statute of Limitations.

Breach of contract claims are governed by a three-year statute of limitation in South Carolina. S.C. Code Ann. § 15-3-530(1). As an

affirmative defense, Dilmar argues, the burden is on the defendant to establish the expiration of the statutory time. Brown v. Finger, 124 S.E.2d 781, 786 (S.C. 1962). If there is conflicting evidence, the issue should be decided by the finder of fact at trial and not by court on summary judgment motion. Garner v. Houck, 435 S.E.2d 847, 849 (S.C. 1993); see Santee Portland Cement Co. v. Daniel Int'l. Corp., 384 S.E.2d 693 (S.C. 1989).

Dilmar asserts that Federated's contractual duty under its policy to reimburse Dilmar for costs incurred in cleaning up Dilmar's contaminated sites did not arise until December 9, 1993. The parties agree that the sole basis for Federated's denials of coverage in 1989 was the CBE in Dilmar's insurance policy. Dilmar says, however, that the CBE operated to render the policy conditionally void, only to allow the insured to become eligible for SUPERB funding. Thus, the 1990 Amendments merely removed the basis on which Federated had previously denied coverage. Because Dilmar did not resubmit its claim at that time, the argument goes, Federated cannot be said to have denied coverage yet.

Dilmar misconceives of the effect of the Amendments. The CBE caused Federated to deny coverage in 1989; the policy was "void for that claim." The 1990 Amendments did not render the earlier denial "ineffective." Rather, they removed the legal basis for the denials, and gave rise to a cause of action for breach of contract and declaratory judgment.

Getting beyond the 1990 or 1992 Amendments would be insufficient for Dilmar, since it still needs to get beyond January 12, 1993, in order to avoid the time bar for its breach of contract claim. Dilmar proceeds to argue that as long as it was covered by the SUPERB program, Federated had no contractual duty to reimburse Dilmar, because Dilmar had not yet "incurred" any costs that would be recoverable under the policy. Insuring Agreement 3 provides for reimbursement for clean-up costs initiated at the insured site during the policy period that the insured "incurs." Dilmar argues that "incur" merely means "to become liable for," and it had not become liable for any costs while it was covered by SUPERB.

Dilmar's attempt to finesse the definition of "incur" is unavailing: when Dilmar hired its own environmental consultants in 1989 it

6

incurred its first cost. Dilmar initially paid all such costs out-of-pocket and submitted the bills to DHEC for SUPERB reimbursement. Dilmar would be the party to whom a contractor would look for ultimate payment if SUPERB failed to reimburse it. Mere reimbursement by the state does not change the ultimate liability for the costs. As Federated points out, the SUPERB Act provides for "reimburse[ment] for reasonable costs incurred in connection with the site rehabilitation. . . ." S.C. Code Ann. § 44-2-130(A). The state does not reimburse costs until they are "incurred."

Dilmar was put on notice that it had a claim against Federated no later than when the 1992 Amendment became effective: the 1990 Amendments invalidated the CBE, and the 1992 Amendment made this invalidation retroactive. Thus, the costs incurred by Dilmar were then subject to reimbursement under the insurance policy, and the contract claim accrued: A cause of action accrues in South Carolina if the party asserting the claim can maintain an action to enforce it. That is the moment the plaintiff has a legal right to sue on it. Brown v. Finger, 124 S.E.2d 781, 785 (S.C. 1962).

Dilmar tries to avoid this by arguing that the discovery rule operated here to toll the running of the statute of limitations. The discovery rule applies to breach of contract actions to toll the running of the statute of limitations until the injury is discovered or should have been discovered. Santee Portland Cement Co. v. Daniel Int'l. Corp., 384 S.E.2d 693, 694 (S.C. 1989). "[T]he statutory period of limitations begins to run when a person could or should have known, through the exercise of reasonable diligence, that a cause of action might exist in his or her favor, rather than when a full-blown theory of recovery is developed." Christiansen v. Mikell, 476 S.E.2d 692, 694 (S.C. 1996). It is immaterial that the claimant did not know the exact nature of the wrong or extent of the damages at the time. Id.

Here, it is undisputed when Dilmar knew, or should have known, that the contract had been breached, when the 1992 Amendment were passed, at the latest. Failure to appreciate the effect of the 1990 and 1992 Amendments cannot toll the running of the statute of limitations. The DHEC even informed Dilmar in the September 3, 1992, letter that Federated's CBE was invalid and unenforceable. Dilmar responded to this letter by saying that it could challenge Federated's

7

coverage denial, but disclaiming any responsibility to do so. DHEC subsequently kept paying, but informed Dilmar that DHEC might itself sue Federated, and subrogation would be needed. At this point, Dilmar knew that the CBE was invalidated by statute, that it was ripe for litigation, and that Federated was not going to be paying Dilmar for costs DHEC said Dilmar owed.

The district court was therefore correct to grant Federated's summary judgment motion on the breach of contract claim because that claim was time-barred by South Carolina's three-year statute of limitations.

B. Liability for the Rice Planters Clean-up.

The district court also granted summary judgment with respect to Federated's argument that it had no liability to Dilmar on DHEC's ordered clean-up of the Rice Planters restaurant site, holding that there was no claim during any applicable policy period. There needed to be a demand from DHEC to Dilmar during an applicable policy period because the relevant contract provision, Insuring Agreement 2, requires Federated to cover costs that the insured incurs because of a governmental demand asserted under statutory authority. Dilmar argues that the court was incorrect because DHEC's demand with respect to Rice Planters, made on June 30, 1994, was merely a continuation of Dilmar's previous claim for the Northside Texaco site, which DHEC said was the "most probable source of contamination" at Rice Planters.

Because Dilmar voluntarily investigated the Northside Texaco site in the Spring of 1989, during its initial SUPERB Act-inspired investigations, reported it, and began remediating it at that time, Dilmar claims that Insuring Agreement 3 applies. That provision covers reimbursement for costs associated with voluntarily initiated clean-up programs. The mere fact that DHEC later wrote Dilmar requesting that it clean up the contamination from that site which spread to an adjoining property does not relieve Federated of its existing duty to cover the costs.

Dilmar's claims are incorrect. DHEC's order to clean up the Rice Planters site constituted a government mandate triggering Insuring

8

Agreement 2. This government mandate was only received in June 1994, however, four years after the last Federated policy expired. And this ordered clean-up was not a continuation of an earlier voluntary clean-up claim.

Dilmar is attempting to bootstrap the Rice Planters claim onto the earlier voluntary clean-up coverage for the Northside Texaco site under Agreement 3. First, the language of the insurance contract is unambiguous: the insuring agreements are mutually exclusive and provide coverage for three distinct events. Allowing a claim triggering one insuring agreement to implicate coverage under one of the other insuring agreements would torture the clear and unambiguous policy language and extend coverage that was never intended by Federated.

Next, the policy provides no coverage for the Rice Planters claim. It says that coverage for the Rice Planters claim, if it exists, is only under Insuring Agreement 2, providing coverage for reimbursement of government-mandated clean-up costs. This agreement requires that "[n]otice asserting such obligation must first be received by [the insured] during the policy period." DHEC only mandated clean-up in June 1994, well after the "policy period." Dilmar attempts to argue that this is covered by Insuring Agreement 3, but it must show that the Rice Planters site was to have been included in the voluntary clean-up Dilmar was conducting at Northside Texaco. When Dilmar submitted its 1989 claim for Northside Texaco, however, only Agreement 3 was implicated because there was no government or third party demand made of Dilmar. The proposed clean-up at Rice Planters is not voluntary--DHEC ordered it. It does not matter whether the contamination at Rice Planters is from Northside Texaco; the dispositive issue is whether the clean-up is being conducted voluntarily. Insuring Agreement 3 only applies to voluntary clean-up cost reimbursement, not to government-ordered clean-up, as is the case here. Allowing Dilmar to obtain coverage for a government-mandated clean-up under the insuring agreement providing coverage for voluntary clean-up costs incurred would render Insuring Agreement 2 a nullity.

The district court was thus correct to grant summary judgment for Federated on Dilmar's demand for coverage of the Rice Planters clean-up.

9

C. Abandonment of the Bad-faith Claim.

In its complaint, Dilmar included a cause of action for bad faith refusal to pay insurance benefits. Dilmar initially argued that Federated's failure to affirmatively provide notice of the passage of the 1990 Amendments was the basis for the bad faith claim (Dil. Opp. to Mot. for S.J. at 21). In its supplemental brief to the district court, submitted after the hearing on Federated's Motion for Summary Judgment, Dilmar said, "Although Federated did not voluntarily offer coverage to Dilmar after the 1990 Amendments became effective, Federated's failure to volunteer coverage should not be considered a denial of coverage, because Dilmar never made a demand for coverage at that time" (Dil. Supp. Opp. to Mot. for S.J. at 3). The district court held that by "acknowledging that Federated's failure to volunteer coverage where no re-tender had been made was not a `denial' of coverage, Dilmar has necessarily abandoned its bad faith claim."

In arguing bad faith as of the 1990 Amendments at the summary judgment stage, which Dilmar did in its original opposition to Federated's motion, Dilmar was arguing for a 1990 accrual date for its claims. Thus, Dilmar had to change its position in the supplemental brief. However, by changing its argument to say that Federated's failure to volunteer coverage in 1990 was not a denial of coverage, Dilmar was no longer asserting a bad faith claim.

Dilmar abandoned its bad faith cause of action in its supplemental opposition to Federated's Motion for Summary Judgment. The district court correctly decided this issue in granting summary judgment.

CONCLUSION

The judgment of the district court is affirmed in its entirety.

AFFIRMED