Judgment affirmed by Supreme Court
opinion filed 2/19/02.

Cert granted by Supreme Court on 4/23/01

PUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SIGMON COAL COMPANY,
INCORPORATED; JERICOL MINING,
INCORPORATED,
Plaintiffs-Appellees,

v.

KENNETH S. APFEL, COMMISSIONER OF

SOCIAL SECURITY,
Defendant-Appellant.

No. 99-1219

TRUSTEES OF THE UNITED MINE
WORKERS OF AMERICA COMBINED
BENEFIT FUND,
Amicus Curiae.

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
Glen M. Williams, Senior District Judge.
(CA-96-148-2)

Argued: October 26, 1999

Decided: August 29, 2000

Before MURNAGHAN, WILKINS, and TRAXLER,
Circuit Judges.

_____

Affirmed by published opinion. Judge Traxler wrote the majority
opinion, in which Judge Wilkins joined. Judge Murnaghan wrote a
dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Kathleen Moriarty Mueller, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Peter Buscemi, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Amicus Curiae. John Ray Woodrum, HEENAN, ALTHEN & ROLES, Washington, D.C., for Appellees. **ON BRIEF:** David W. Ogden, Acting Assistant Attorney General, Robert P. Crouch, Jr., United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Margaret S. Izzo, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; John R. Mooney, MOONEY, GREEN, BAKER, GIBSON & SAINDON, P.C., Washington, D.C.; David W. Allen, Jonathan Sokolow, UMWA HEALTH & RETIREMENT FUNDS, Washington, D.C., for Amicus Curiae. W. Gregory Mott, HEENAN, ALTHEN & ROLES, Washington, D.C.; H. Ronnie Montgomery, MONTGOMERY LAW OFFICE, Jonesville, Virginia, for Appellees.

_____

**OPINION**

TRAXLER, Circuit Judge:

Under the Coal Industry Retiree Health Benefit Act of 1992 (the Coal Act), see 26 U.S.C.A. §§ 9701-9722 (West Supp. 1998), the Commissioner of the Social Security Administration ("Commissioner") assigns fiscal responsibility for a retired coal miner's health benefits to the most appropriate coal mining company which employed the retired miner or, if the assigned coal operator is no longer in business, to an entity or individual that qualifies as a "related person" to the defunct coal company. See 26 U.S.C.A. § 9706(a). In 1993, the Commissioner assigned eighty-six retired coal miners to the Jericol Mining Company ("Jericol") on the basis that Jericol was a successor in interest to, and therefore a "related person" to, an out-of-business mining company that had employed the retired miners. The district court determined, based on a literal reading of the statutory text, that a successor in interest to a defunct signatory operator cannot be held accountable under the Coal Act as a "related person" and

2

voided the Commissioner's assignments. See Sigmon Coal Co. v. Apfel, 33 F. Supp.2d 505, 508-11 (W.D. Va. 1998). The Commissioner appeals, contending that the district court's literal reading of the statute frustrates congressional intent to provide broad coverage for retired coal miners by identifying the "most responsible" employers, and that, in light of the general congressional purpose and various snippets of legislative history, we should read the statutory definition of "related person" to include a successor in interest to a signatory operator.

We decline the Commissioner's invitation to rewrite the Coal Act. The statute is clear and unambiguous, and we are bound to read it exactly as it is written. Accordingly, we affirm the decision of the district court.

I.

A.

The Coal Act of 1992 was passed in an effort to remedy a faltering system of healthcare benefits for the nation's retired coal miners. See Eastern Enterprises v. Apfel, 524 U.S. 498, 504-15 (1998). On a handful of occasions, this court has carefully detailed the history of the coal industry's attempt to establish, through collective bargaining, an adequate system of health and retirement benefits for coal miners and the resulting labor unrest and financial instability which led to the Coal Act of 1992. See Holland v. Big River Minerals Corp., 181 F.3d 597, 600-01 (4th Cir. 1999), cert. denied, 120 S. Ct. 936 (2000); Holland v. Keenan Trucking Co., 102 F.3d 736, 738-39 (4th Cir. 1996); Carbon Fuel Co. v. USX Corp., 100 F.3d 1124, 1127-29 (4th Cir. 1996). We need not recount the full history of the coal miners' health and retirement benefits system. Nevertheless, since the Coal Act incorporates specific benefit plans established by the coal wage agreements, consideration of the statutory scheme at issue requires at least a rudimentary understanding of these plans.

Between 1950 and 1978, a series of National Bituminous Coal Wage Agreements ("coal wage agreements") between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators Association ("BCOA") produced a number of multiem-

3

ployer benefit plans. The 1950 coal wage agreement established a multiemployer fund to furnish health and retirement benefits for both coal miners and their dependents. See Carbon Fuel, 100 F.3d at 1127. Benefits under this fund, however, were determined at the discretion of the trustees of the fund and were subject to reduction according to the fund's budget. See Eastern Enterprises, 524 U.S. at 506-08. Thus, the miners were not guaranteed specific benefits.

In 1974, the UMWA and the BCOA entered into a coal wage agreement that expanded the benefits available under the 1950 coal wage agreement, creating four multiemployer plans to replace the 1950 fund:

> The 1974 [coal wage agreement] . . . divided the 1950 Plan into several separate multiemployer plans. It established a 1950 Pension Plan and Benefit Plan and a 1974 Pension Plan and Benefit Plan. The 1950 Benefit Plan provided health-care benefits to miners who retired prior to January 1, 1976, and their dependents. The 1974 Benefit Plan provided health-care benefits to miners who were active, or who retired on or after January 1, 1976, and their dependents.

Carbon Fuel, 100 F.3d at 1127. Significantly, the 1974 coal wage agreement promised, in contrast to the prior agreements, lifetime benefits. Signatory coal operators to the 1974 coal wage agreement pledged to finance both the 1950 Benefit Plan and the 1974 Benefit Plan, but their obligation to do so did not extend beyond the effective dates of the agreement. See Eastern Enterprises, 524 U.S. at 509-10.

In 1978, the UMWA and the BCOA again reorganized the health-care benefit system for coal miners, this time moving toward decentralization. Under the 1978 coal wage agreement, a coal miner retiring on or after January 1, 1976, would be provided benefits by his last employer pursuant to an individual employer plan. The 1974 Benefit Plan continued to exist, but only to cover miners, known as "orphans," who had retired on or after January 1, 1976, and whose last employer was no longer participating in the multiemployer plans or had gone out of business. Likewise, the 1950 Benefit Plan would continue to afford benefits to miners who had retired prior to January 1,

4

1976 and their dependents. See Carbon Fuel, 100 F.3d at 1127. There were two other noteworthy features of the 1978 coal wage agreement. First, the agreement required signatory operators to provide defined benefits rather than defined contributions as under previous agreements. See Holland, 181 F.3d at 600-01. Second, the agreement included an "evergreen" clause requiring signatories to continue contributing even if they did not sign a subsequent agreement, as long as they remained in the coal industry. See Eastern Enterprises, 524 U.S. at 510.

The series of coal wage agreements and the numerous restructurings to the coal miners' health benefit system effected by the coal wage agreements occurred against a backdrop of severe financial distress. By the latter part of the 1980s, the 1950 and 1974 Benefit Plans were facing the possibility of insolvency as many signatories to the 1978 coal wage agreement left the coal mining business, sending their retirees -- now newly orphaned -- back into the multiemployer 1974 Benefit Plan. An increasingly small number of signatories shouldered the burden of funding the plan, which was providing healthcare benefits -- the cost of which were rising -- for a growing number of orphaned retirees. See id. at 511; Carbon Fuel, 100 F.3d at 1127. These factors, among others, created a vortex which simultaneously decreased funds and increased beneficiaries, and threatened to undo the whole system.

The dire financial state of the 1950 and 1974 Benefit Plans ultimately spurred a lengthy strike in 1989 at the Pittston Coal Company, which, in turn, prompted the creation of the Advisory Commission on United Mine Workers of America Retiree Health Benefits ("Coal Commission") to devise a solution to the problem of health benefits for retired miners. Following the submission of recommendations by the Coal Commission, Congress passed the Coal Act of 1992.

B.

The Coal Act of 1992 established two new multiemployer health benefit funds. The first of these, the United Mine Workers of America Combined Benefit Fund ("the Combined Fund"), resulted from the merger of the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan. See 26 U.S.C.A. § 9702(a)(2). In general terms, the Com-

5

bined Fund provides health benefits to retired miners (or their dependents) who were eligible to receive benefits from the 1950 or the 1974 Plan and were receiving benefits as of July 20, 1992. See 26 U.S.C.A. § 9703; see also Eastern Enterprises, 524 U.S. at 514; Holland, 181 F.3d at 601. The second fund established by the Coal Act, the UMWA 1992 Benefit Plan, provides health benefits"to any eligible beneficiary who is not eligible for benefits under the Combined Fund." 26 U.S.C.A. § 9712(b)(1).[1] We are concerned here only with the Combined Fund.[2]

The Coal Act charges the Commissioner with assigning responsibility under the Combined Fund for each eligible retiree to an appropriate coal industry employer. The Commissioner is required, pursuant to a three-tiered priority scheme, to pair each retiree "to a signatory operator which (or any related person with respect to which) remains in business." 26 U.S.C.A. § 9706(a). An assigned signatory operator must pay an annual premium to the Combined Fund based largely on the number of beneficiaries assigned to it. See 26 U.S.C.A. § 9704. A "signatory operator" is "a person which is or was a signatory to a coal wage agreement." 26 U.S.C.A. § 9701(c)(1). For purposes of the Coal Act, a signatory operator "remains in business" if it "conducts or derives revenue from any business activity, whether or not in the coal industry." 26 U.S.C.A. § 9701(c)(7).

In assigning retirees to signatory operators, the Commissioner must observe the following priority scheme:

      (1) First, to the signatory operator which--

      (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

_____

[1] Thus, the UMWA 1992 Benefit Plan covered retired miners who were eligible for but were not drawing benefits under the 1950 or 1974 UMWA Benefit Plans and who were also not receiving benefits under an individual employer plan. See Holland, 181 F.3d at 601.
[2] The Coal Act also required coal operators to continue the individual employer plans established under the 1978 coal wage agreement or a subsequent coal wage agreement. See 26 U.S.C.A. § 9711.

6

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which--

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C.A. § 9706(a)(1)-(3).

Even if there are no signatory operators that remain in business to whom a retiree can be assigned, responsibility for the retiree's Combined Fund benefits may still be attached to anyone qualifying as a "related person" to a signatory operator that would have been responsible for benefits had it remained in business. See 26 U.S.C.A. § 9704(a) ("Any related person with respect to an assigned operator shall be jointly and severally liable for any premium required to be paid by such operator."). The Coal Act defines a "related person" as follows:

(2) Related Persons.--

(A) In general.-- A person shall be considered to be a related person to a signatory operator if that person is--

(i) a member of the controlled group of corporations (within the meaning of section 52(a) [of the

7

Internal Revenue Code]) which includes such sig-
natory operator;

(ii) a trade or business which is under common
control (as determined under section 52(b) [of the
Internal Revenue Code]) with such signatory oper-
ator; or

(iii) any other person who is identified as having
a partnership interest or joint venture with a signa-
tory operator in a business within the coal indus-
try, but only if such business employed eligible
beneficiaries, except that this clause shall not
apply to a person whose only interest is as a lim-
ited partner.

A related person shall also include a successor in interest of
any person described in clause (i), (ii), or (iii).

26 U.S.C.A. § 9701(c)(2)(A). According to the language of the stat-
ute, even if the signatory operator and its related persons are defunct,
coverage for the retiree can be assigned to a "successor in interest" to
a related person. The term "successor in interest," however, is left
undefined by the Coal Act. A related person or its successor in inter-
est is not liable for Combined Fund premiums unless the related per-
son was related as described in section 9701(c)(2)(A) "as of the time
immediately before such operator ceased to be in business." 26
U.S.C.A. § 9701(c)(2)(B).

In the event there is no signatory operator or related person remain-
ing in business, and there is no successor in interest to any entity that
is "related" to a signatory operator within the meaning of section
9701(c)(2)(A), then the retiree or his dependents are unassigned but
not uncovered. The Coal Act requires the assigned signatory operators
to cover the benefits for the unassigned miners on a pro rata basis. See
26 U.S.C.A. § 9704(d). The premiums paid on behalf of the unas-
signed miners' benefits are reduced by the transfer of funds from the
Abandoned Mine Land Reclamation Fund (the "AML Fund"). See 26
U.S.C.A. § 9705(b); 30 U.S.C.A. § 1232(h) (West Supp. 1998).

8

C.

In 1973, Irdell Mining, Incorporated ("Irdell") bought the coal mining operating assets of the Shackleford Coal Company ("Shackleford"), a family-owned coal mining company in Kentucky. There was no common ownership between Irdell and Shackleford. According to the terms of the asset purchase agreement, Irdell assumed responsibility for Shackleford's contractual and lease arrangements, including the collective bargaining agreement with the United Mine Workers. Otherwise, Irdell did not assume Shackleford's liabilities. Following the sale of assets, Shackleford changed its name to Kelly & Associates, which dissolved shortly after the sale. For several years after the sale, Irdell used the Shackleford name, which it was permitted to do pursuant to the asset purchase agreement. Eventually, it changed its name to Jericol Mining Company. It is undisputed that Jericol continued Shackleford's coal operations, using many of Shackleford's employees. Jericol, while it was using the Shackleford name, signed the 1974 coal wage agreement that expired in 1977. Jericol did not sign any subsequent agreements.

From September 1993 to September 1997, the Commissioner assigned to Jericol, in piecemeal fashion, eighty-six coal miners who had retired from Shackleford and qualified as Combined Fund beneficiaries. These retirees worked for Shackleford, but they retired prior to the asset sale and thus never worked for Jericol. The Commissioner's original notice of assignment to Jericol explained that these retirees were assigned on the basis that Jericol was a"related person" to Shackleford, a signatory operator that would have been the assignee had it not been defunct:

> Our records and UMWA records indicate that you are related to the signatory operator named below [Shackleford] who is no longer in business. This operator would have been responsible under the law for the miner named below under the rules for how we assigned responsibility . . . . Therefore, as a related company you must assume responsibility.

J.A. 64. Jericol requested that the Commissioner reconsider the assignment, disputing that it was a "related person" to Shackleford within the meaning of the Coal Act. The Commissioner reaffirmed

9

the series of assignments of Shackleford's retirees to Jericol, however, indicating that Jericol was responsible as a "successor in interest" to Shackleford. In confirming his decision, the Commissioner provided Jericol with a number of written explanations which were substantially identical:

> While Jericol admits purchasing part of Shackleford's assets in 1973, the company maintains it was not a successor in interest. However[,] Jericol adopted use of the Shackleford name, continued to operate under Shackleford's UMWA agreement and otherwise acted as its successor. Therefore Jericol is Shackleford's successor. Shackleford was the last coal company to employ the miner. Since Shackleford is a pre-78 signatory and employed the miner for more than 24 months the assignment must be made under category three. Shackleford employed the miner longer than any other coal company that is still active or has an active related company. Therefore the original assignment was correct.

J.A. 94.

Jericol then brought this action, seeking a determination that it is not responsible for the Shackleford retirees. The district court concluded that under section 9701(c)(2)(A), a successor in interest to a defunct signatory operator (assuming Shackleford is one) cannot be held accountable as a "related person" to that signatory operator, reasoning that because Jericol did not succeed to any person described in clauses (i), (ii), or (iii) of section 9701(c)(2)(A), it did not qualify as a "related person" to Shackleford under the unvarnished terms of the statute. See Sigmon Coal, 33 F. Supp.2d at 510. The Commissioner argued that, regardless of the language of the statute, the court should read the definition of "related person" to include a successor in interest to a signatory operator because, when applied literally, the statute leads to results that are absurd or, at the very least, much different from what Congress intended. The district court rejected this argument, finding the meaning of the statute clear on its face. See id. at 510-11. Thus, the district court held that the clear and unambiguous language obviated the need for it to defer to the Commissioner's interpretation under Chevron, U.S.A., Inc. v. Natural Resources

10

<u>Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984). The Commissioner then brought this appeal.

II.

First, we must determine whether we have subject matter jurisdiction to reach the substantive issues raised in this appeal. The parties did not raise this issue in either their briefs or at oral argument. Subsequently, the Commissioner, pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, raised the possibility that the district court lacked jurisdiction under <u>Pittston Co. v. United States</u>, 199 F.3d 694 (4th Cir. 1999), a decision that was issued following oral argument in this case.

We are duty-bound to clarify our subject matter jurisdiction even if the parties do not develop it as an issue. <u>See Cook v. Georgetown Steel Corp.</u>, 770 F.2d 1272, 1274 (4th Cir. 1985) ("Although plaintiffs have not questioned the district court's jurisdiction, lack of subject matter jurisdiction is an issue that requires sua sponte consideration when it is seriously in doubt."). Unlike personal jurisdiction, subject matter jurisdiction cannot be waived. <u>See Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 704 (1982). Accordingly, we must address the basis of our jurisdiction even when the parties do not pursue the topic of subject matter jurisdiction full bore. <u>See United States v. White</u>, 139 F.3d 998, 999-1000 (4th. Cir.), <u>cert. denied</u>, 525 U.S. 933 (1998).

Thus, we directed the parties to submit supplemental briefs on the following question:

> Whether, in light of this court's holding that Coal Act premiums are taxes, <u>see Pittston Co. v. United States</u>, 199 F.3d 694, 701-03 (4th Cir. 1999); <u>UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)</u>, 99 F.3d 573, 583 (4th Cir. 1996), and the federal courts' lack of jurisdiction to consider "suit[s] for the purpose of restraining the assessment or collection of any tax," 26 U.S.C.A. § 7421(a) . . ., the court has jurisdiction over this action.

11

The parties submitted supplemental briefs, and we now address the district court's subject matter jurisdiction.

A.

The Anti-Injunction Act, see 26 U.S.C.A. § 7421(a) (West Supp. 2000), and the tax-exclusion provision of the Declaratory Judgment Act, see 28 U.S.C.A. § 2201(a) (West 1994), reflect "[t]he congressional antipathy for premature interference with the assessment or collection of any federal tax." Bob Jones University v. Simon, 416 U.S. 725, 732 n.7 (1974). The Anti-Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C.A. § 7421(a). The Act has two primary objectives: "efficient and expeditious collection of taxes with `a minimum of pre-enforcement judicial interference,' and protection of the collector from litigation pending a refund suit." United States v. American Friends Serv. Comm., 419 U.S. 7, 12 (1974) (per curiam) (quoting Bob Jones, 416 U.S. at 736-37). Unless an exception to the Anti-Injunction Act applies, "the legal right to the disputed sums [must] be determined in a suit for a refund." Bob Jones, 416 U.S. at 736 (emphasis added) (internal quotation marks omitted).

The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration" unless the action seeks a declaration of rights or legal relations "with respect to Federal taxes." 28 U.S.C.A. § 2201(a) (emphasis added). Even "[t]hough the Anti-Injunction Act concerns federal courts' subject matter jurisdiction and the tax-exclusion provision of the Declaratory Judgment Act concerns the issuance of a particular remedy, the two statutory texts are, in underlying intent and practical effect, coextensive." UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573, 583 (4th Cir. 1996).

In Leckie, we concluded that, for purposes of the Anti-Injunction Act and the tax-exclusion provision of the Declaratory Judgment Act, Coal Act premiums are taxes. See Leckie, 99 F.3d at 583; see also Pit-

12

tston, 199 F.3d at 702. Thus, any action that can be construed as having "the purpose of restraining the assessment or collection" of Coal Act premiums, i.e., taxes, potentially strips us of jurisdiction under the Anti-Injunction Act and runs afoul of the tax-exclusion provision of the Declaratory Judgment Act.

However, "the Anti-Injunction Act `was not intended to bar an action where . . . Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax.'" Leckie, 99 F.3d at 584 (ellipsis in original) (quoting South Carolina v. Regan, 465 U.S. 367, 370-71 (1984)). Leckie involved an effort by bankrupt coal operators to secure a declaration from the bankruptcy court that the purchasers of their assets would not be liable for Coal Act premiums as successors in interest to the bankrupt coal operators. We concluded that the bankrupt coal operators "[did] not have any `alternative legal way' to challenge the imposition of Coal Act successor liability on the purchasers of their assets." Id. The Leckie operators "need[ed] to know whether they [could] sell their assets free and clear of liability for their Coal Act premiums," id., that is, they were challenging Coal Act premiums on potential purchasers, not their own Coal Act liability. The Anti-Injunction Act and the Declaratory Judgment Act therefore did not preclude the Leckie court from considering the merits because "the Coal Act [does not] provide any means by which a coal operator can challenge the imposition of successor liability on a third party." Id.

In Pittston, we considered whether it was proper for coal operators to assert a constitutional challenge to premiums they were required to pay under the Coal Act via a tax refund action against the United States. See Pittston, 199 F.3d at 699. Rejecting the idea that the Coal Act provides the exclusive procedure by which a coal operator can obtain a refund of premiums paid on behalf of an incorrectly assigned retiree, we held that "a tax refund action is an appropriate vehicle for Pittston to use to seek recovery of . . . Coal Act premiums." Pittston, 199 F.3d at 704. In doing so, we underscored our holding in Leckie that Coal Act premiums are taxes. Id. at 702. The coal operators in Pittston, however, sought no injunctive or declaratory relief; they simply sought a refund of their Coal Act premiums.

13

B.

Jericol's action against the Commissioner includes a request for both declaratory and injunctive relief. The complaint seeks an order (1) declaring "that neither Jericol nor Sigmon is a successor in interest to Shackleford within the meaning of 26 U.S.C. § 9701(c)(2)(A)," J.A. 13, (2) "enjoin[ing] the Commissioner from assigning any Shackleford retirees to [Jericol] in the future," J.A. 14, and (3) "direct[ing] the Commissioner to (i) withdraw the assignment of Shackleford's retirees to Jericol, and (ii) inform the Combined Fund that such assignments have been withdrawn," J.A. 13. In its complaint, Jericol asserted that three specific statutory bases vested the district court with subject matter jurisdiction: the Declaratory Judgment Act; the Administrative Procedures Act ("APA"); see 5 U.S.C.A. § 704 (West 1996); and sections 9706 and 9721 of the Coal Act. Jericol has not paid the Coal Act premiums on behalf of the retirees whom Jericol claims were improperly assigned to it.

The Commissioner contends that the Anti-Injunction Act and the Declaratory Judgment Act deprived the district court of authority to consider Jericol's action. According to the Commissioner, the relief that Jericol seeks -- an order requiring the Commissioner to withdraw assignments made to Jericol -- would have the eventual effect of preventing the collection of Coal Act taxes because "[i]t is . . . the Commissioner's assignment of a beneficiary to an operator that gives rise to that operator's liability for premiums under the [Coal] Act." Supplemental Brief of Appellant at 5. The Commissioner contends that, even if Jericol's action does not directly impede the collection or assessment of taxes, this action is aimed at restraining a preliminary step to the actual collection of Coal Act premiums and thus falls within the purview of the Anti-Injunction Act. See Bob Jones, 416 U.S. at 731-32; Clark v. United States (In re Heritage Church & Missionary Fellowship), 851 F.2d 104, 105 (4th Cir. 1988) (per curiam). And, argues the Commissioner, unlike the coal operators in Leckie, Jericol has several alternative means of challenging the assignment of the retirees, depriving the district court of subject matter jurisdiction. See Leckie, 99 F.3d at 584. Having carefully considered the supplemental briefs of the parties and the Amicus Curiae, we conclude that neither Leckie nor Pittston precluded the district court from exercising jurisdiction.

14

The Coal Act itself provides a specific scheme for coal operators such as Jericol to challenge the assignment of retirees by the Commissioner under section 9706. Section 9706(f) prescribes a procedure for obtaining administrative review of beneficiary assignments by the Commissioner and contemplates that the administrative procedure will be subject to judicial review. First, an assigned operator that is dissatisfied with an assignment may "request from the Commissioner . . . detailed information as to the work history of the beneficiary and the basis of the assignment." 26 U.S.C.A. § 9706(f)(1). If an examination of this material does not persuade the assigned operator that the assignment was appropriate, the operator may then request review of the assignment by the Commissioner who "shall conduct such review if . . . the operator provided evidence with the request constituting a prima facie case of error." 26 U.S.C.A. § 9706(f)(2). Regardless of whether the Commissioner ultimately determines that the assignment was or was not in error -- or that assigned operator did or did not present a prima facie case of error -- the "determination by the Commissioner . . . under paragraph (2) or (3) shall be final." 26 U.S.C.A. § 9706(f)(4). The final decision of the Commissioner is subject to review "by a court under this subsection." 26 U.S.C.A. § 9706(f)(5). As a final agency decision, the review process is governed by the APA. See 5 U.S.C.A. § 704; Dixie Fuel Co. v. Commissioner of Social Security, 171 F.3d 1052, 1057-58 (6th Cir. 1999) (applying APA review to Commissioner's assignment of beneficiaries in an action for injunctive relief); Lindsey Coal Min. Co. v. Chater, 90 F.3d 688, 691 (3rd Cir. 1996) (applying APA review to Commissioner's assignment of beneficiaries in an action seeking declaratory relief). Of course, the APA is not an independent grant of subject matter jurisdiction to the federal courts. See Califano v. Sanders, 430 U.S. 99, 107 (1977). Rather, 28 U.S.C.A. § 1331 serves as the jurisdictional basis for federal courts "to review agency action." Id. at 105. The Coal Act clearly anticipates that this review scheme will apply to the Commissioner's assignment of beneficiaries and that, accordingly, a district court will have the power to review such assignment and issue appropriate relief.

Here, unlike Leckie, the assigned operator is simply following a procedure mapped out in the Coal Act specifically for this situation. See Leckie, 99 F.3d at 584. The coal companies in Leckie were not seeking review of the Commissioner's assignments, as specifically

15

permitted in the statute; rather, they were seeking a declaration with respect to Coal Act liabilities of a third party, a question for which there was no adequate remedy under the Coal Act or outside of it. (For example, the Leckie coal operators could not seek relief under 26 U.S.C.A. § 7422.) See id. (noting that"the Coal Act itself [does not] provide any means by which a coal operator can challenge the imposition of successor liability on a third party").

This distinction is pivotal. "It is a basic principle of statutory construction that when two statutes are in conflict, a specific statute closely applicable to the substance of the controversy at hand controls over a more generalized provision." Farmer v. Employment Sec. Comm'n of North Carolina, 4 F.3d 1274, 1284 (4th Cir. 1993). Thus, "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976) (internal quotation marks omitted). Congress has expressly provided a method for coal operators to obtain review of the assignment of beneficiaries under section 9706(a). Because the Coal Act specifically addresses this issue, we conclude that the Coal Act, not the more general Anti-Injunction Act, controls the jurisdictional analysis.

Nevertheless, the Commissioner contends that the language of section 9706(f)(5) supports the argument that the Anti-Injunction Act applies because section 9706 creates, if anything, only a "post-payment remedy." Section 9706(f)(5) provides that"[a]n assigned operator shall pay the premiums under section 9704 pending review by the Commissioner of Social Security or by a court under this subsection." The Commissioner submits that this language is more consistent with a tax refund action than with an action for injunctive or declaratory relief, and supports the policy of the Anti-Injunction Act to facilitate the collection of tax revenue. At bottom, the Commissioner is arguing that the phrase "pending review" created a jurisdictional barrier for the district court.

We are not convinced. First, the language of the statute does not indicate or imply that the district court is deprived of jurisdiction to review the Commissioner's assignments unless the assigned premiums have first been paid. And, we do not perceive section 9706(f)(5)

16

to preclude the possibility of declaratory or injunctive relief. Indeed, Jericol could seek precisely the same type of relief it now seeks whether or not it paid its premiums pending review. Second, the structure of section 9706(f) suggests otherwise. The requirement that the assigned operators pay their premiums "pending review . . . by a court" applies just as forcefully "pending review by the Commissioner of Social Security." But, the statute makes clear that this is not a prerequisite to review by the Commissioner who "shall conduct such review if the Commissioner finds . . . a prima facie case of error." 26 U.S.C.A. § 9706(f)(2) (emphasis added). Nothing in the language of the statute indicates that Congress meant for the phrase "pending review" to apply differently to review by a court. Third, the Coal Act provides an incentive to make timely premium payments to the Combined Fund in that it imposes penalties for failure to do so. See 26 U.S.C.A. § 9707. Consequently, the requirement that assigned operators pay their premiums pending review is not a hollow provision.

We likewise believe that Pittston is a different case from the one before us and does not curtail the jurisdiction of a district court in an action simply challenging the Commissioner's assignment of beneficiaries under section 9706(a). We say this primarily because we were not required in Pittston to address the applicability of the Anti-Injunction Act or the tax-exclusion provision of the Declaratory Judgment Act. Pittston held that a tax refund action was "an appropriate vehicle" for a coal operator that was seeking the repayment of Coal Act premiums based on its contentions that (1) the Coal Act violated a number of constitutional principles as applied; and (2) the premiums had been improperly calculated. See Pittston, 199 F.3d at 699. Thus, nothing in Pittston precludes the exercise of jurisdiction in an action like this one.[3]

_____

[3] Moreover, we note that the premium miscalculation claim in Pittston does not appear to be a claim that even fits under section 9706(f). The review procedures set forth in section 9706(f) are confined specifically to the assignment of Coal Act beneficiaries to signatory operators or their "related persons." See 26 U.S.C.A.§ 9706(f)(2) ("An assigned operator may . . . request review of the assignment."). Section 9706(f) does not, however, provide review for an improperly calculated premium; thus, the proper recourse for a miscalculation claim would be, as we explained in Pittston, through either a tax refund action or through additional overpayment remedies provided under the Coal Act or ERISA. See Pittston, 199 F.3d at 703-04.

17

Under the circumstances of this case, we find that the exercise of jurisdiction is appropriate.**4**

III.

Having concluded that the district court had subject matter jurisdiction, we now turn to the merits. The Commissioner advances a two-fold argument. First, he contends that the district court misread the statute and that, in fact, a straight reading of the final paragraph of section 9701(c)(2)(A) shows that a successor in interest to a signatory operator qualifies as a related person, which would permit the assignment of the retirees and beneficiaries to Jericol. Second, the Commissioner argues that if the district court's reading of the statutory text is correct, it is a reading that produces inexplicable, anomalous results that are clearly at odds with congressional intent. In support of this second argument, the Commissioner urges us to follow R.G. Johnson Co. v. Apfel, 172 F.3d 890, 894-96 (D.C. Cir. 1999), a split-panel decision of the District of Columbia Circuit Court of Appeals sanctioning just such an approach.**5**

A.

We cannot agree with the Commissioner that a successor in interest to a signatory operator falls within the Coal Act's definition of "related person." Section 9701(c)(2)(A) establishes three categories of persons that qualify as "related persons" to signatory operators: (1)

_____

**4** Our conclusion is consistent with Eastern Enterprises, which affirmed the exercise of jurisdiction over an action for declaratory and injunctive relief, although the Court did not expressly consider the same jurisdictional issue we consider here. See Eastern Enterprises, 524 U.S. at 519-22.

**5** In order to resolve the issue presented to us, we need not address Jericol's argument to the extent it suggests that under the Coal Act, the terms "successor" and "successor in interest" are distinct, see Leckie, 99 F.3d at 585 n.15, and that Jericol does not qualify as a "successor in interest" to Shackleford. Like the district court, we leave these questions for another day, and we will simply assume, for analytical purposes, that Jericol is indeed a successor in interest to Shackleford, whatever the precise nuances of that term.

18

"member[s] of the controlled group of corporations . . . which includes such signatory operator[s]," 26 U.S.C.A. § 9701(c)(2)(A)(i); (2) "trade[s] or business[es]" that are "under common control" with the signatory operator, see 26 U.S.C.A.§ 9701(c)(2)(A)(ii); and (3) certain persons having a partnership interest or engaged in a joint venture with a signatory operator, see 26 U.S.C.A. § 9701(c)(2)(A)(iii). The ultimate paragraph of section 9701(c)(2)(A) provides that "[a] related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii)." 26 U.S.C.A. § 9701 (c)(2)(A) (emphasis added).

Jericol does not qualify as a "related person" to Shackleford under clauses (i), (ii) or (iii) of section 9701(c)(2)(A), and the Commissioner does not suggest as much. Rather, he hangs his hat on the last paragraph, contending that "any person described in clause (i), (ii), or (iii)" includes signatory operators because the term "signatory operator" appears in each of the three clauses. Such a reading of the text, however, would require us to completely ignore the statutory context and read the phrase "signatory operator" in a vacuum. The final paragraph of section 9701(c)(2)(A) plainly says "successor in interest of any person described in clause (i), (ii), or (iii)." Thus, to be a "related person" under the statute, Jericol must be a successor in interest to a person who is described by clause (i), (ii), or (iii). Shackleford, a signatory operator to whom Jericol succeeded in interest (according to the Commissioner's argument), is not described in any of these three predicate clauses. The text makes this self-evident by explaining that a person described in clause (i), (ii), or (iii)"shall be considered to be a related person to a signatory operator." 26 U.S.C.A. § 9701(c)(2)(A) (emphasis added). The statutory definition of "related person" obviously turns on the relationship a person or company has to a signatory operator. Each clause describes persons who are connected to a signatory operator in a way that justifies "related person" status. The inclusion of the term "signatory operator" in each clause just explains the connection. As the court observed in R.G. Johnson, to read this subsection as the Commissioner suggests would produce a nonsensical definition of "related person":

> Because the persons described in those clauses are described in terms of their relationship to the signatory operator, it would seem evident that they cannot include the signatory

19

> itself. To suggest otherwise is tantamount to saying "I am related to me." . . . [T]he Commissioner cannot overcome the fact that in order to be deemed a related person, a successor in interest must be one to a person described in those clauses.

R.G. Johnson, 172 F.3d at 894 (emphasis in original).

Like the Commissioner, the Trustees of the UMWA Combined Benefit Fund, as Amici Curiae, advance an argument that is based on a somewhat circular interpretation of the text: that "signatory operator" is necessarily described in clause (i) because, by definition, it is a member of a group "which includes such signatory operator." This is simply another version of the Commissioner's argument, and it suffers from the same contextual infirmity.

We are confident the Coal Act excludes a successor in interest to a signatory operator from the definition of "related person." The text makes this clear and unambiguous. Thus, we need not defer to the interpretation of the Social Security Administration. See Chevron, 467 U.S. at 842-43.

B.

1.

If we apply the statute the way Congress has written it, the Commissioner fears that we will nevertheless do violence to what Congress probably intended and that our reading of the statute will lead to anomalous ends. If a literal reading of a statute produces an outcome that is "demonstrably at odds" with clearly expressed congressional intent to the contrary, United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989), or results in an outcome that can truly be characterized as absurd, i.e., that is "'so gross as to shock the general moral or common sense,'" Maryland State Dep't of Educ. v. United States Dep't of Veterans Affairs, 98 F.3d 165, 169 (4th Cir. 1996) (quoting Crooks v. Harrelson, 282 U.S. 55, 59-60 (1930)), then we can look beyond an unambiguous statute and consult legislative history to divine its meaning. But, such instances are, and should be,

20

exceptionally rare. See TVA v. Hill, 437 U.S. 153, 187 n.33 (1978). The intent of Congress as a whole is more apparent from the words of the statute itself than from a patchwork record of statements inserted by individual legislators and proposals that may never have been adopted by a committee, much less an entire legislative body -- a truth which gives rise to "the strong presumption that Congress expresses its intent through the language it chooses." INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987). Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it. See Caminetti v. United States, 242 U.S. 470, 485 (1917) ("[T]he sole function of the courts is to enforce [the statute] according to its terms."). This principle applies, too, in the face of an agency's construction of the statute that it administers. See Chevron, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). As a result, we are more than a little hesitant to abandon the presumption that Congress meant what it said, or did not say, when the words of a statute are plain, as they are here.

Pressing his argument that our reading of the statute contravenes congressional intent, the Commissioner points first to the congressional findings and declaration of policy prefacing the Coal Act. See Pub. L. No. 102-486, § 19142, 106 Stat. 3036, 3037 (1992). In light of the troubled history that for decades dogged the system of multiemployer benefit plans for coal miners, Congress determined that "it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees." Pub. L. No. 102-486, § 19142(a)(2), 106 Stat. 3036, 3037 (1992) (emphasis added). According to the Commissioner, our reading of the definition of "related person" produces results that are at cross-purposes with the explicit congressional pronouncement that it intended "to identify persons most responsible for plan liabilities." Specifically, he questions the logic of imposing, as section 9701(c)(A)(2) clearly does, "related person" liability upon a successor in interest to a "related person" but not upon a successor in interest to the signatory operator itself. The Commissioner argues that there cannot be a more

21

responsible person for Combined Fund liabilities than Jericol, a company that took over Shackleford's mining operation, used its name for a period of time, and agreed to assume Shackleford's responsibilities under its collective bargaining agreement with the UMWA. Apparently the only other circuit court of appeals to have considered this issue held, in a split panel decision, that such a result ran contrary to the general purpose of the Coal Act, reasoning that there was simply no good reason for such an odd result. See R.G. Johnson, 172 F.3d at 895.

We are not convinced, however, that the literal language of section 9701(c)(2)(A) is contrary to clearly expressed congressional intent. First, the general and somewhat vague statement of congressional findings in the preamble to the Coal Act does not impress us as the kind of pellucid expression of legislative intent that would displace a specific textual provision that is clear and unambiguous. And, even if it were, we do not automatically agree with the Commissioner's apparent assumption that an asset purchaser like Jericol is obviously the "most responsible" person where these miners are concerned. After all, Jericol never actually employed any of the miners at issue; it is certainly not an absurd notion to think that a company which was under common financial control with Shackleford during the miners' employment (and therefore a "related person"), or a successor in interest to such a company, could be considered the "most responsible" person for Combined Fund purposes. As Jericol has suggested, the benefits conferred by the retired miners in this case ran to Shackleford and those in financial partnership with it. To the extent that the retired Shackleford miners conferred a benefit on Jericol, such as improving the physical assets of the operation or advancing the goodwill of the company through their hard work, Jericol presumably paid fair market value for these benefits under the terms of the asset purchase.

The Commissioner's position is not strengthened by the legislative history to which he and the Amici point us. First, they offer a statement made during the floor debate by one of the sponsors of the Coal Act which interpreted the definition of "signatory operator" under section 9701(c)(1) to include a successor in interest to the signatory operator. See 138 Cong. Rec. S17566-01, 17634 (daily ed. Oct. 8, 1992) (statement of Sen. Rockefeller). If we were presented with an ambiguous statute, such commentary might conceivably provide some inter-

22

pretive guidance; however, even then such comments would be of limited use since they are directed at the definition of "signatory operator" as opposed to "related person." But we have been asked to consider a statute that does not need interpretation. The statute simply does not encompass a successor in interest to a signatory operator. Moreover, a brief comment from the floor by a single legislator, albeit one of the Act's sponsors, is not conclusive evidence of what the entire legislative body believes. See United States Dep't of State v. Washington Post Co., 456 U.S. 595, 600 (1982) ("Passing references and isolated phrases are not controlling when analyzing a legislative history.").

Second, the Commissioner offers portions of a document from the Congressional Record in an attempt to establish clear legislative intent to the contrary. Specifically, he points to a technical explanation of the Coal Act inserted into the Congressional Record by Senator Wallop which maintains that a "related person" includes "in specific instances successors to the collective bargaining agreement obligations of a signatory operator." 138 Cong. Rec. S17566-01, S17604 (daily ed. Oct. 8, 1992).[6] We refuse to displace a clear statutory provision which was passed by both houses of Congress and signed into law by the President with an explanation proffered by a single member of Congress. While worthy of consideration, it is simply not the sort of conclusive legislative history that would trump contrary language in the statute. See Garcia v. United States, 469 U.S. 70, 76-77 (1984) (preferring legislative history that reflects the collective understanding of a committee to the views of an individual legislator). We have found nothing in the Conference Report itself to suggest that other members of Congress signed on to this interpretation of the statute. See H.R. Conf. Rep. No. 102-1018 (1992). And, R.G. Johnson supports us on this score as well, observing that the relevant legislative history is inconclusive. See R.G. Johnson, 172 F.3d at 894.

_____

[6] The parties refer to this material as a proposed conference report. We agree that this material was never adopted by the Conference Committee, but prefer to describe the material as did the Senator who introduced it into the Congressional Record -- as a technical explanation.

23

We are satisfied that the legislative history on this point should not displace the language of the statute as a tool for determining congressional intent, especially when Congress included elsewhere in the statute language that the Commissioner wants us to read into the definition of "related person." For purposes of the UMWA 1992 Benefit Plan and the individual employer plans which the Coal Act kept in place, Congress specifically defined the term "last signatory operator" to include "a successor in interest of such operator." 26 U.S.C.A. § 9711(g)(1). Congress could easily have included this phrase in the final paragraph of section 9701(c)(2)(A). It did not do so, however, and we think this suggests that Congress acted intentionally when it omitted a successor in interest to a signatory operator from the definition of "related person." See Russello v. United States, 464 U.S. 16, 23 (1983) ("`[W]here Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'").

Accordingly, we decline to defer to the legislative history in the face of clear statutory language.

2.

Finally, the Commissioner argues that we cannot follow the statute as it is written because the way Congress has drafted the "related person" definition begets, under the right set of circumstances, some fairly odd results. For instance, why would Congress allow a company that has literally taken over the coal mining production of a defunct signatory operator (assuming such a company is a successor in interest) to escape liability, but pin financial responsibility on a successor in interest to a company that was unrelated to the coal industry -- say, a trucking company -- merely because the trucking company and the signatory coal operator were under common financial control prior to the passage of the Coal Act? In light of the statutory purpose, says the Commissioner, it would have been wiser to make it the other way around.

We are not persuaded that there is no logic to shielding successors in interest to signatory operators from liability but not successors in interest to "related persons." Jericol submits, as did Judge Randolph

24

in his dissent to R.G. Johnson, that such a provision (making succes-
sors in interest to "related persons" liable instead of successors in
interest to signatory operators) promotes the sale of coal companies:

> Without the exemption, prospective purchasers can never be
> sure of their risks. Their liability would depend on whether,
> sometime in the future, the seller -- that is, the signatory
> operator -- ceases to "remain[] in business," a matter
> wholly outside their control.

R.G. Johnson, 172 F.3d at 896 (Randolph, J., dissenting). And,
indeed, such an idea makes sense in view of the historical backdrop
and legislative history, which suggest that perhaps Congress had good
reason after all to pass section 9701(c)(2)(A) in its current version, the
Commissioner's argument to the contrary notwithstanding. As
observed in the Coal Commission's report to Congress, over half of
the pre-Coal Act beneficiaries were "orphans" who were drawing ben-
efits from a pot jointly funded by coal operators. See Secretary of
Labor's Advisory Commission on United Mine Workers of America
Retiree Health Benefits, Coal Commission Report, Executive Sum-
mary vii (1990) (Coal Commission Report). A major complaint
lodged by the coal operators was that they were being required to pay
benefits for retired miners who never worked for them or maintained
any other relationship with them. See 138 Cong. Rec. S17566-01,
S17607 ("The coal companies that are still fully signatory to the bar-
gaining agreement have complained that for every dollar they have
been paying into the UMWA 1950 and 1974 Health Benefit Funds for
their own retirees and dependents, they pay an additional three dollars
on behalf of `orphans' of other companies."). Imposing liability under
the Combined Fund upon successors in interest to signatory operators
would produce the same results because operators that did not receive
the benefit of the retired miners' employment would nevertheless be
responsible for them under the Combined Fund. In fact, such a
requirement would arguably have put coal operators who purchased
another operator's assets in a worse position since under the Act they
are solely responsible for their assigned retirees. Jericol suggests that
in an industry where buying and selling coal mining assets is com-
monplace, such a provision would present a significant impediment
to the coal companies' support for the Coal Act, which, in turn, would
supply Congress with a motive for omitting the provision. Indeed, the

25

scheme for assigning retirees to coal operators was a point of contention throughout the legislative process. See 138 Cong. Rec. S18250-02, S18250 (daily ed. Oct. 8, 1992) (statement of Sen. Glenn) ("[T]he coal industry retiree health benefits package before us today has been among the most contentious matters facing legislators this year.").

Clearly, the explanation Jericol offers is not indisputably evident from extra-textual sources; however, it is certainly plausible, and that is all we need to reject the assertion that the Coal Act's definition of "related person" is, on its face, absurd. And, we recognize that there is a counterpoint to the idea that Congress may have been trying to foster the sale or transfer of coal companies -- that if this were truly a congressional aim, Congress would also have exempted a successor in interest to a "related person" when the "related person" is a company involved in the coal industry, rather than a trucking company or some other company that is not tethered to the coal industry. See R. G. Johnson, 172 F.3d at 895. But, even if this is true -- if the literal text of the statute produces a result that is, arguably, somewhat anomalous -- we are not simply free to ignore unambiguous language because we can imagine a preferable version. See United States v. Sheek, 990 F.2d 150, 153 (4th Cir. 1993) ("Even if the result appears to be anomalous or absurd in a particular case, the court may not disregard unambiguous language."). Perhaps it would be good policy to exempt successors in interest to "related persons" in the coal industry. As Judge Randolph observed, however, "Congress rarely has to go as far as its logic would take it." R. G. Johnson, 172 F.3d at 896. For us to read into the statute language that is simply not there would require us to believe that the text as Congress drafted it produced an absurdity "`so gross as to shock the general moral or common sense.'" Maryland State Dep't of Educ., 98 F.3d at 169 (quoting Crooks, 282 U.S. at 59-60). We see nothing in section 9701(c)(2)(A) to convince us that this is one of those rare instances in which we should stray from the words of the statute itself.

What we are being asked to do is improve the statute-- to amend it, really. The Commissioner's reading of the statute may be appealing in terms of its logic, but we cannot adopt it as our own without trespassing on a function reserved for the legislative branch:

26

> [I]f Congress did not say what may appear more reasonable, and said something else, a court may not step in and perform a congressional, <u>i.e.</u>, legislative, act.
>
> . . . We must interpret statutes as written, not as we may wish for them to be written. Congress' role is to enact statutes; the judiciary's to interpret those statutes as written.

<u>United States v. Childress</u>, 104 F.3d 47, 53 (4th Cir. 1996).**7** Because our job is to determine the meaning of the statute passed by Congress, not whether wisdom or logic suggests that Congress could have been done better, we conclude that section 9701(c)(2)(A) does not affix "related person" liability upon a successor in interest to a signatory operator.

IV.

For the foregoing reasons, the decision of the district court is affirmed.

<u>AFFIRMED</u>

MURNAGHAN, Circuit Judge, dissenting:

Because the majority's adherence to the literal language of the Coal Act's definition of "related persons" produces a result demonstrably at odds with the intentions of its drafters, I respectfully dissent.

_____

**7** We also decline the invitation of the <u>Amici</u> to use our interpretations of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), <u>see</u> 42 U.S.C.A. § 9601 (West 1995 & Supp. 1998), as an interpretive guide to section 9701(c)(2)(A) of the Coal Act. <u>See United States v. Carolina Transformer Co.</u>, 978 F.2d 832, 837-38 (4th Cir. 1992) (adopting successor liability under CERCLA). Since the meaning of the text here is self-explanatory, there is no need for us to make a dubious attempt at determining whether the apparent intent of one Congress in enacting a statute is at all useful for discovering the intent of another Congress in enacting a separate, unrelated statute.

I.

The crisis in the coal industry that preceded the passage of the Coal Act resulted from the financial instability of the 1950 and 1974 Benefit Plans. In the 1978 Coal Wage Agreement, individual signatory operators assumed responsibility for providing health benefits for their post-1975 retirees and active workers. The 1978 Agreement retained the 1974 Benefit Plan as an "orphan" plan to provide health benefits for post-1975 retirees whose last employer had gone out of business. The 1950 Benefit Plan was also retained to provide benefits for miners who had retired before 1976 and their dependents. See Eastern Enters. v. Apfel, 524 U.S. 498, 510 (1998).

The 1978 Agreement did not work because several signatories left the mining business, "dumping" their retirees on the 1950 and 1974 Benefit Plans. The signatories that remained had to shoulder the burden of paying for the growing number of orphaned retirees, while at the same time paying for the health care of their own retirees. The rising costs of providing for orphaned retirees caused more signatories to leave the coal mining business, exacerbating the crisis. The coal industry thus was caught in a vicious circle that threatened to deprive more than 100,000 retired coal miners and their dependents of their promised lifetime health benefits. See id. at 511.

Congress responded to the crisis by enacting the Coal Act in 1992. Congress wanted to avoid the problems that plagued the coal industry in the 1980s--too many unallocated retirees supported by signatory operators that did not have any connection to the retirees. The Act therefore assigned liability for retiree health benefits to "related persons" to signatory operators as well as to the signatory operators themselves. See 26 U.S.C. § 9706(a). As a result, if a signatory operator went out of business, a "related person" would be on the hook for the signatory operator's retirees. Only when the Commissioner could not locate a "related person" still "in business" would the rest of the coal industry have to support an "orphaned" retiree. See 26 U.S.C. § 9704(a)(3), (d), § 9706(a).

The Coal Act defines related persons in § 9701(c)(2)(A), which provides:

28

(2) Related persons.--

(A) In general.-- A person shall be considered to be a related person to a signatory operator if that person is--

 (i) A member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator;

 (ii) a trade or business which is under common control (as determined under section 52(b)) with such signatory operator; or

 (iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

<u>A related person shall also include a successor in interest of any person described in clause (i),(ii), or (iii)</u>.

26 U.S.C. § 9701(c)(2)(A) (emphasis added). The issue in the instant case is whether the definition of "related persons" includes successors in interest to signatory operators.[1]

_____

[1] For purposes of my analysis, and in response to the majority's reasoning, I assume Jericol qualifies as a successor in interest to Shackleford. I would not reach this issue on appeal, however, because the district court has not ruled on the issue. See R.G. Johnson Co. v. Apfel, 172 F.3d 890, 895 (D.C. Cir. 1999) (refusing to consider whether a coal company qualified as a "successor in interest" to a signatory operator because the district court had not ruled on the issue).

29

II.

I agree with the majority's conclusion that a literal reading of § 9701(c)(2)(A) unambiguously excludes successors in interest to signatory operators. I therefore would not defer to the Commissioner's strained interpretation of the definition. I would nevertheless construe § 9701(c)(2)(A) to include successors in interest to signatory operators because I agree with the D.C. Circuit that the instant case is one of those "rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." R.G. Johnson Co. v. Apfel, 172 F.3d 890, 895 (D.C. Cir. 1999) (quoting United States v. Ron Pair Enters., 489 U.S. 235, 242 (1989)).

A literal interpretation of the definition of "related persons" causes a result that directly conflicts with Congress's stated purpose in enacting the Coal Act. Congress declared that its purpose in enacting the Act was "to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees." Pub. L. No. 102-486, § 19142(a)(2), 106 Stat. 3037 (codified at note following 26 U.S.C.§ 9701). Outside of the signatory operators, no entities are "more responsible" for plan liabilities than successors in interest to signatory operators. Here, for example, Jericol took over Shackleford's mining operations, employed many of its workers, and assumed its duties under the collective bargaining agreement with the UMWA. In addition, the asset purchase agreement between Shackleford and Jericol **2** included a clause allowing Jericol to use Shackleford's well-known corporate name. Jericol thus benefitted from the goodwill created, at least in part, from the work of the retirees that Jericol now attempts to dump on the rest of the coal industry.

A literal interpretation of the definition of "related persons," however, would turn Congress's stated purpose on its head: entities with only a tenuous connection to the retired coal miners would be jointly and severally liable for Fund benefits while direct successors to the signatory operators who employed the miners are excluded from liability. For example, under a literal interpretation of § 9701(c)(2)(A),

_____

**2** Jericol was then known as Irdell Mining, Inc.

30

a thrice-removed successor in interest to a food distributor under common control with a signatory coal mine operator would be liable for the health benefits of a signatory's retired coal miners, while a company like Jericol, a coal mining direct successor in interest to a signatory operator, would be excluded from liability. Congress could not have intended such an anomalous result.

My conclusion is in accord with the only other circuit to consider this issue. In R.G. Johnson, the D.C. Circuit stated that

> [i]n light of [the purpose of the Act] and the broad reach of the provisions imposing liability on related persons, we can think of no reason why Congress would have intended to impose liability for the beneficiaries on, for example, a successor in interest to a Coca-Cola bottling company under common control with a signatory coal mine operator while exempting a coal-mining successor in interest to that operator.

Id. at 895. The court therefore held that it would construe § 9701(c)(2)(A) to include successors in interest to signatory operators. See id.

In the instant case, the majority recognizes that a literal interpretation of "related persons" causes a result "that is, arguably, somewhat anomalous." Maj. op. at 26. However, seizing on the theory advanced in Judge Randolph's dissent in R.G. Johnson, the majority attempts to explain the anomalies by speculating that Congress may have intended to exclude successors in interest to signatory operators from liability to promote the sale of coal companies.

I disagree with the majority's theory because it presumes that Congress intended to promote the exact practice that necessitated legislative action in the first place. The widespread dumping of retirees by signatory operators leaving the coal industry was the principal cause of the coal industry's crisis. The remaining signatory operators were forced to shoulder the burden of paying for more orphaned retirees, thereby encouraging more signatories to leave the industry. In light of this history, it is unimaginable that Congress could have intended

31

to promote the sale of coal companies to successors who would not be liable for Fund benefits.

Furthermore, excluding successors in interest from liability for retiree benefits does more than <u>promote</u> the sale of coal companies; it <u>actively encourages</u> the sale of coal companies. Under the majority's interpretation of the Act, coal companies are worth more to successors than they are to signatory operators. For instance, Jericol can avoid $237,000 in yearly contributions to retirees if successors are not liable under the Act. Other coal companies undoubtedly have significantly higher contributions under the Act.**3** A successor who can avoid these costs will be willing to pay more for a coal company than the value of the company as an ongoing entity, because the successor could avoid a major liability of the company.

Profit-seeking signatory operators therefore will maximize shareholder value by selling their assets to a successor, distributing the proceeds to shareholders, and then dissolving. The remaining signatory operators will have to shoulder the burden of paying for the retirees of signatories who leave the business, further raising their costs of doing business; the additional costs will, in turn, encourage more signatories to sell their assets to successors. The ultimate result would be the same dwindling funding base that Congress intended to rectify by passing the Act. The majority's theory thus suggests that Congress intended to cure the crisis in the coal industry by infecting it with part of the disease.**4**

_____

**3** For instance, a signatory operator who has been in the industry since the 1960s would be liable for the health benefits for thirty years of retirees. Under the majority's analysis, a successor to this company would be liable for none of these benefits.

**4** Some might suggest that coal companies are unlikely to attempt to profit from such a "loophole" in the Coal Act; however, this suggestion ignores the fact that coal companies have a long history of using the tools of successorship to maximize shareholder profits at the expense of workers and retirees. <u>See generally</u> Grant Crandall et al., <u>Hiding Behind the Corporate Veil: Employer Abuse of the Corporate Form to Avoid or Deny Workers' Collectively Bargained and Statutory Rights</u>, 100 W. Va. L. Rev. 537 (1998).

32

Finally, the majority offers no explanation for why Congress was concerned with promoting the sale of coal companies, but was not concerned with promoting the sale of companies related to a signatory operator. Instead, the majority baldly states that "Congress rarely has to go as far as its logic would take it." Maj. op. at 26. However, as is evident from my previous analysis, it was <u>clearly illogical</u> for Congress to exclude successors in interest to signatory operators from liability in the first place. Thus, to accept the majority's theory, one must believe that Congress was inconsistently illogical.

III.

The majority is rightfully cautious about judicially "rewriting" an unambiguous statute. Nevertheless, our duty is to give effect to the intent of Congress. Congress's intent is usually expressed in the plain meaning of a statute, but that is not always the case. The Supreme Court has stated that

> [l]ooking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists."

<u>Public Citizen v. United States Dep't of Justice</u>, 491 U.S. 440, 455 (1989) (quoting <u>Boston Sand & Gravel Co. v. United States</u>, 278 U.S. 41, 48 (1928)). Excluding successors in interest to signatory operators from liability for Fund benefits is plainly inconsistent with Congress's intent in enacting the Coal Act. I therefore would construe § 9701(c)(2)(A) as allowing the assignment of Fund beneficiaries to successors in interest to signatory operators. Accordingly, I dissent.

33